Commonwealth *v.* Richardson, Appellant.

Argued January 6, 1958. Before JONES, C. J., BELL, CHIDSEY, MUSMANNO, JONES and COHEN, JJ.

*Fronefield Crawford,* with him *Crawford & Frazier,* for appellant.

*Ernest L. Green,* Assistant District Attorney, with him *J. Harold Hughes,* First Assistant District Attorney, and *Raymond S. Start,* District Attorney, for appellee.

OPINION BY MR. JUSTICE BELL, May 2, 1958:

The defendant, Jerold Richardson, was convicted by a jury of first degree murder and sentenced to life imprisonment. In this appeal he seeks a new trial because of alleged trial errors.

Defendant, together with James Ryder and James Graham, was indicted for the murder of Roy Wunder, who was found dead at about 12:50 a.m. on Monday, September 20, 1954, in a taproom operated by him known as "Stony Creek Tavern" which is located on the Baltimore Pike, Springfield, Delaware County, Pa. Defendant was 17 years of age at the time of the crime. All three of the individuals involved applied for and were granted separate trials.

Defendant, through his court-appointed attorney, applied prior to trial, and during the trial for a change of venue; these applications were refused. Defendant, prior to trial and during the course of the examination of jurors on voir dire, applied for a continuance; these applications were refused.

Roy Wunder, the deceased, went to the Stony Creek Tavern sometime on Sunday evening, September 19, 1954. At approximately 12:50 a.m., on Monday morning, September 20th, Maurice Gouse was operating his automobile in an eastwardly direction towards Philadelphia and as he passed the Stony Creek Tavern his attention was directed to the breaking of glass. He looked at the Tavern building and saw two men, whom

he described as teenagers because of their dress and build, come through the window. He then noticed these same two individuals run to an automobile which was parked on an intersecting street near the Tavern. Gouse saw the lights of the automobile go on and the automobile start up, turn onto the Baltimore Pike, and then proceed in a westwardly direction towards Media, Pa. Gouse attempted to follow the get-away car in his own automobile, but was out-distanced. He then reported the incident to police officers who accompanied him to the Stony Creek Tavern and after gaining entrance, discovered the body of Roy Wunder.

Wunder's body was lying in the back of the barroom; there were bar stools overturned, a vase on the floor, and part of a top of a stool and broken water glasses on the floor. Gouse found a bullet on the cocktail lounge seat near the front of the barroom. This was proved to be the fatal bullet and was identified as a .38 S. & W. caliber. The gun used in the killing has never been found. Gouse gave the police a description of the automobile he pursued although he was not certain of some of its characteristics. The automobile as described by Gouse has never been located. It was later discovered that entrance to the taproom was gained through a skylight that led into the men's washroom.

Defendant was in the custody of the Philadelphia Police Department from December 14, 1954 until December 28, 1954, at which time he escaped from custody. He was rearrested on January 3, 1955. Sergeant McCrory and other officers questioned Richardson the same morning about some 60 or more burglaries in Philadelphia. At that time McCrory had *no knowledge* of the Stony Creek Tavern killing.

McCrory testified that defendant told him on January third that he and James Ryder and James Gra-

ham, had driven to the Stony Creek Tavern and that Graham and Ryder entered the Tavern to rob it while he, Richardson, remained in the automobile. McCrory notified his superior who in turn notified the Delaware County authorities. That afternoon defendant admitted to Sergeant McCrory in detail his participation in the robbery. However, when he was informed that a murder had taken place at the Tavern, he denied any participation in the robbery. On January 4th, at about 11:45 p.m., after being questioned about the murder of Wunder, he signed a confession admitting his participation in the robbery during which Wunder was murdered.

Defendant's confession was read to him by the District Attorney of Delaware County, Raymond R. Start, in the presence of six other persons who signed defendant's confession as witnesses. In addition three other police officers and the official court stenographer were present, although they did not sign as witnesses. Seven of those who were present when the defendant's confession was read to him and when he executed it testified at the trial; five of the seven, including the District Attorney, Mr. Start, testified unequivocally that defendant voluntarily made and signed the confession and was not coerced, threatened or given any promises. The other two witnesses were not asked this question.

The relevant and material portions of defendant's confession (in question and answer form) are as follows: "Q. Do you know why you have been arrested? A. Yes. Q. Why? A. Homicide. Q. Do you want to make a voluntary statement? A. Yes. Q. It is my duty to warn you that anything you say or sign can be used against you at the time of your trial in court. Do you understand that? A. Yes. Q. In making this statement, do you make it of your own free will, without fear, force, threats or promises? A. Yes. Q. Jerold,

will you go on in your own words and tell us what you know concerning the shooting and murder of Roy E. Wunder, 46 years, white, proprietor of the Stony Creek Tavern, 334 Baltimore Avenue, Springfield Township, Delaware County, Pa., which occurred on Monday morning, September 30, 1954, at about 12:45 or 12:50 a. m. A. I met James Ryder about 12:00 p.m. Sunday afternoon, September 19, at 7th and Susquehanna Avenue. We got a trolley car and went down to 68th and Elmwood Avenue and went into a luncheonette known as 'Tony's'. We met Jim Graham. He told us about a gun store out on the Baltimore Pike which we could burglarize. We stayed around there until 3:00 o'clock and then went into the center of town in Philadelphia in Jim's car, Jim Graham driving. It was a 1950 Nash station wagon dark, I don't know what color. We went to 13th and Market in town and hung around the Arcadia until about dusk and then went out on the Baltimore Pike and I was driving at the time and Jim Graham directed. As we were passing the tavern, Jim stated that he knew of it being robbed before or that he himself robbed it. He said that we would find a small cabinet safe inside; that he and Ryder would go in while I stayed slouched in the car. They left the car and that was the last I seen of them until I heard a sound that I cannot identify; a few minutes later the breaking of glass. Then they came running around the corner of the building and jumped in the car. I shot out, down past the light, made a right and made another right a couple blocks down, that's the last I remember, Jim was directing. I am not familiar with the neighborhood until we finally got back to Tony's. When me and Ryder emerged from the car, Jim keeping the gun in the car. Me and Ryder then got a cab and dropped him off at 7th and York and proceeded home myself. Q. Is everything you have told

us in this statement the truth? A. Yes. Q. Can you read and write the English language? A. Yes. Q. How high did you go in school? A. Twelfth grade."

". . . Q. Did Ryder and Graham have a gun? A. They both had guns. Q. Did you know what kind of guns they were? A. Two revolvers. Q. Do you know what caliber? A. I believe one was a .38, might have both been .38's, I am not sure. Q. Where did you first see these revolvers? A. Outside Tony's. Q. Did they have them in the car? A. Yes. Q. Did you see them? A. Yes. Q. And they took these guns to the tavern? A. I assumed they did. Q. What else did they take, if anything? A. Some talk of mentioning about a bar to get into the place. . . . Q. What were your duties on this job besides driving the car? A. I was to be the lookout. Q. Now after Ryder and Graham went into this taproom, what was the next thing that occurred? A. I heard some noise I couldn't identify, not too loud, but a noise. Several minutes later I heard a glass break. Q. When was the first time you saw either of these boys after you heard the glass break? A. About thirty seconds later I seen them come around the corner. Q. What, if anything, did they say when they arrived at the car? A. Graham said, 'You're crazy.' Q. Graham said, 'You're crazy' to whom? A. To Ryder. Q. Anything else? A. I asked what happened and Graham said, 'Ask him.' Q. Meaning Ryder? A. Yes. Q. Did you ask Ryder what happened? A. Ryder told me to 'Get the hell out of here.' Q. What did you do when Ryder told you to 'get the hell out'? A. Made a right on Baltimore Pike going west. . . . Q. And returning from the taproom by the way of the route you described to Tony's place, was there anything said about the guns? A. They said they had better get rid of them, Jim said that, he will take care of them. Q. What Jim do you mean? A. Graham. Q. Let me understand

this. James Ryder said something about the guns and Jim Graham said he would take care of them. A. He said, 'Keep cool,' 'I will take care of them.' Q. Did he say what he was going to do with them? A. No. . . . Q. Who described to you what occurred inside the taproom the morning Roy Wunder was killed? A. Ryder. Q. When did he describe this to you? A. In a cab. Q. Was that on your way to 7th and York? A. Yes. Q. What did he say? A. He told me Graham fired the shot. He said a man threw a chair at him and Graham went to duck and as he ducked both guns were cocked and pressure, Graham's pressure, his finger on the trigger, it startled Graham. That's what Ryder told me. I asked Graham and he told me just the opposite. Q. What did Graham say to you? A. I asked him what happened. I said who shot him. Red said 'you killed a man.' Graham said, 'I didn't shoot him, Ryder shot him.' . . . Q. On the 3rd of January, 1955, did you tell Sergeant McCrory a story? A. Yes. Q. Was that story you told Sergeant McCrory in City Hall in Philadelphia, a true story? A. Yes. Q. But you didn't tell him the complete story? The story you are telling me now, did you? A. No, almost the same thing."

On January 5, 1955, defendant, Ryder, and Graham were taken to the Stony Creek Tavern where Ryder pointed out to the police the place where the automobile was parked and defendant confirmed Ryder's statement.

Defendant testified in his defense. He denied having participated in the robbery and repudiated his oral and his written confession. He testified that he did not sign the confession until after he had read a statement signed by Ryder in which the latter allegedly stated that Richardson had also gone into the taproom. Defendant stated that he did not intend to sign any statement until after he was shown Ryder's statement,

and that he signed his confession only because the police suggested that he put himself in the car and thus fully or partially escape responsibility for the crime.

Moreover, with respect to the conversation with Sergeant McCrory, defendant testified on direct examination—in an attempt to explain his oral confession: "Q. All right, now, will you go ahead with your conversation with Sergeant McCrory. A. I don't remember the exact conversation. Mr. McCrory did ask me about the Springfield job, which I told him yes, I done. Then—Q. At that time did you know what he was talking about? A. No sir, I didn't know anything about it. I thought it was just another burglary, *and I realized they had me for about 60 or 70\** by that time, and I did not want to argue with the man about it. Q. So what was the next thing that was said about it? A. Well, he related to me about where the place was on Baltimore Pike, I can't get the exact conversation, the exact words that were used. Q. Was there anything said by him at that time regarding any person being shot? A. Well, sir, he continued to tell me about this burglary; *and I continued to admit it up to the time that he said that the man was shot and I denied it then.* I told him that I was talking about something else, another job completely out on the Baltimore Pike, it was a gun store, I said I didn't know anything about that. He smiled at me, patted me on the shoulder and walked away, saying I understand."

On cross-examination the defendant testified: "Q. Now on the 4th when you originally told Sergeant McCrory about being out, being on that Springfield job, you likewise told him Graham and Ryder were with you? A. That's right. Q. And that was before either of them signed the statement concerning you?

---

\* Italics throughout, ours.

A. I did not realize what it was at the time. Q. Later you said today that you put them in because they were trying to put you in the middle, is that right? A. That is why I signed the statement I said, sir. Q. *Yes, but here you put Ryder and Graham in verbally that morning before you knew they signed statements?* A. *That's right.* Q. Well then it is not true that you signed this statement because they were putting you in the middle, was it? A. I thought that they had done it and that they were trying to frame me for it. Q. That is why you signed it? A. That is when I signed the statement. Q. But they hadn't put you in the middle in the morning when you told it verbally that you were out to Springfield and Graham and Ryder were with you? A. No, they did not put me in it then. Q. You were putting them in then? A. No. . . . Q. Then you were willing to go for the burglary, but when you learned he died you wouldn't, is that right? A. I wasn't going to go for no killing I didn't do. Q. But you went for the burglary part of it? A. Well they had me charged for 70, and I wanted to get in the cell and lay down, I didn't want to argue with him; they had worked me over that night before, I didn't want nothing like that again."

In repudiating the written confession the defendant testified as follows: "Q. When was the next time you were questioned? A. I believe at nine o'clock that night. Q. And who was present at that time? A. Leon Pitz, Sergeant McCrory, a man from the Juvenile Aid, Earl Allen, and I believe there were two or three more. Q. And what was the general conversation at that time? A. Well first they brought me in and asked me the same thing, am I going to tell the same thing that Sergeant McCrory told them? And I said no, I didn't have nothing to do with it. I denied it for 15 or 20 minutes. And there was another man came in, I don't

know if it was Inspector Driscoll or who it was, they had a statement signed by Ryder. Do you know Jimmy Ryder's signature. I said yes. He said is that it? I said I don't know. How come you don't know? You just told me you knew his signature. I said it looks like his signature. He said, read the statement. I said, I don't want to read that statement. They kept on me, read it, read it, read it. So I finally looked down, they had it turned back to a page; I read that part on the page. And in the meantime, why, I don't know, about five minutes after that I read, I read the statement, I read the whole thing from beginning to the end. And I still told Mr. Allen to bring in Graham, whom they told me was out there making a statement. They said his father made him make a statement. He said, see what these two guys are trying to do? They are going to put you in the middle. Sergeant McCrory was sitting beside me, I believe I was handcuffed to Mr. Pitz at the time. Mr. Allen got up and said the hell with you, go burn anyway, we got one; and he walked out. That is when Sergeant McCrory put his hand on my shoulder and said, look, son, there is an out for you, you were in the car, they can't get you. I said, look, I am accessory before and after the fact if I put myself in the car. He said, look, these two guys are trying to put you in the middle. Then I told him, all right, that I would make a statement, that I would put myself out in the car; which he called Mr. Allen back in and I made the statement."

Richardson's testimony was often so evasive, conflicting, inconsistent and false as to be obviously unworthy of belief. In addition to the testimony above quoted, defendant on cross-examination testified that Graham, whom he had always implicated in the robbery and murder, should not have been involved even in his "false stories and confession"; rather, another

individual by the name of Lawson was the person he really meant to implicate in his stories and confession, although even these he testified were false. We also note that during the course of the trial a large number of convictions for burglaries and robberies against defendant were introduced into evidence (a) to assist the jury in fixing the penalty, and (b) for the purpose of testing defendant's credibility.

Defendant also presented an alibi to the effect that he attended a dance on the Sunday night in question with a "friend" known to him as Martin Davis. He was corroborated in this respect by the testimony of Ernest M. Greaves, Jr., a member of the U. S. Air Force, who testified that he was the individual known to the defendant as Martin Davis. Greaves stated that he used the name Martin Davis because that was his name prior to the remarriage of his mother early in his life. However, Greaves failed to satisfactorily explain the use of the first name "Ernest" instead of "Martin", along with the surname of "Greaves". Greaves recalled having attended a dance with defendant and fixed the particular night in question because it was the night following a wedding attended by him and the defendant. There was proof that there was a dance on the night in question. Defendant's father also recalled having seen Greaves and the defendant in the Richardson home on Sunday evening, September 19, 1954, although he was unable to fix the exact time.

Defendant bases his motion for a new trial on three alleged trial errors. The first and second alleged errors are closely inter-related and will be disposed of together. Defendant contends that the lower Court erred in refusing his repeated applications for (a) a change of venue, and (b) a continuance. In support of these contentions he states that the Stony Creek

Tavern murder had received a tremendous amount of publicity through newspaper articles and detective stories, thus creating undue excitement and inflammatory public opinion against him. Furthermore, he argues that he was further prejudiced through some additional publicity which resulted from some beer drinking by him and one of his co-defendants in the cell block of the courthouse during the same term of court. More importantly, he contends he was further prejudiced because an alleged confederate, James Ryder, had just been tried in the same courtroom and because the jury trying him had just retired for purposes of deliberation. To further substantiate his contentions he states: "There were 100 jurors called on voir dire and of that number, more than 60% had read about the case and 10% admitted having a preconceived opinion as to the guilt or innocence of the appellant."

In dismissing defendant's initial petition for a change in venue, the lower Court said: "We have read all of the exhibits furnished by Counsel and cannot find any undue sensationalism in the articles. It might, of course, be better if articles covering crime could be withheld from print until the case is over, but this is not the accepted manner of procedure in America. However, we are not satisfied that the defendants' rights have been prejudiced and believe that they will have a fair trial by jurors, who do not know about the occurrence despite the publicity."

In regard to this issue, a review of the record discloses that many jurors who did read of the case in the newspapers, did so only at the time of the murder—*13 months before*—and not recently. Some of these individuals testified, moreover, that they only read the headlines. Even more important, Richardson *concedes* that no prospective juror who admitted

having an opinion about the case was accepted as a member of the jury. There is no merit in this contention.

It is clearly established that the grant or refusal of a change of venue or of a continuance is within the sound discretion of the trial Court: *Commonwealth v. Capps,* 382 Pa. 72, 114 A. 2d 338; *Commonwealth v. Simmons,* 361 Pa. 391, 65 A. 2d 353; *Commonwealth v. Flood,* 302 Pa. 190, 195, 196, 153 A. 152, 153; *Commonwealth v. Deni,* 317 Pa. 289, 292, 293, 176 A. 919, 920, 921; *Commonwealth v. Lockard,* 325 Pa. 56, 62, 63, 188 A. 755, 758; *Commonwealth v. Schurtz,* 337 Pa. 405, 408, 409, 10 A. 2d 378, 380; *Commonwealth v. Chavis,* 357 Pa. 158, 166, 167, 53 A. 2d 96, 100.

In *Commonwealth v. Capps,* 382 Pa., supra, the Court said (page 77) : "The first alleged trial error is the refusal of the court below to grant defendant's requests for continuance and change of venue. At the request of defendant's counsel the trial fixed during the week of March 22, 1954, was continued until April 26, a period of three months after date of the killing. The learned trial Judge ruled that the newspaper stories were not so inflammatory and biased in factual presentation as to cause, or be evidence of, public prejudice or hysteria. The granting, or refusing, of a change of venue or continuance, is within the sound discretion of the trial court: Commonwealth v. Simmons, 361 Pa. 391, 65 A. 2d 353, and the many cases cited therein. We have reviewed all the evidence and do not regard that the trial Judge abused his discretion."

Furthermore, what this Court said in *Commonwealth v. Fletcher,* 387 Pa. 602, 128 A. 2d 897 (page 611) is appropriate and controlling on the question of prejudice by the jury: "The language of the Court in Commonwealth v. McGrew, 375 Pa. 518, 525, 100 A.

2d 467, is likewise applicable in the instant case: 'The fact that a juror has read or heard about a case and has an impression or an opinion, or a prejudice is not ground for rejection for cause if he testifies and the Court believes that his opinion is not fixed and that he can and will make up his mind solely from the evidence which will be presented at the trial of the case: Com. v. Crossmire, 156 Pa. 304, 308, 27 A. 40; Com. v. Nye, 240 Pa. 359, 370, 87 A. 585; Com. v. Eagan, 190 Pa. 10, 42 A. 374; Com. v. DePalma, 268 Pa. 25, 100 A. 756.' "

We find no abuse of discretion by the trial Court, and there is no merit in any of defendant's aforesaid contentions.

The third and most important contention made by defendant is that the trial Judge in his charge to the jury committed reversible error by (a) inadequately charging the jury on alibi; and (b) failing to charge the jury that the evidence of alibi may, with the other facts in the case, raise a reasonable doubt as to the appellant's guilt. The jury was charged by the trial Judge, inter alia, as follows:

"The burden is on the Commonwealth to convince you beyond a reasonable doubt that the defendant, Jerold Richardson, is guilty of the crime charged against him before you can convict him. *That burden never shifts. That burden remains with the Commonwealth from the beginning of the case down to the very end,* and the defendant is not required to take the stand nor is he required to interpose to the jury a defense. And even though he might not take the stand or might not interpose a defense, *the burden would still remain with the Commonwealth to convince you jurors beyond a reasonable doubt,* which the court will in a little while define, of his guilt before you could find him guilty.

"Now on the other hand there has been not only a denial in this case from the witness stand that this defendant participated, but there has been something else brought up in the defendant's case as an affirmative defense, and that is the question of alibi; because if this defendant convinces you by a fair preponderance of the evidence—not beyond a reasonable doubt, he does not have that burden, but if he convinces you by the weight of the evidence, by a fair preponderance, the balancing of the scales in his favor, that his alibi is true, *then of course he could not have been at the place where he is said to have been by the Commonwealth, he would have been at another place and he could not have committed this crime.* . . .

"So that the Commonwealth's burden, in order to convince you of the defendant's guilt is beyond a reasonable doubt that they must convince you; the defendant, on the other hand, in interposing an affirmative defense such as alibi, need only raise the issue by a fair preponderance of evidence."

The trial Judge further charged the jury: "Now, members of the jury, this defendant is innocent until he has been proven guilty beyond a reasonable doubt. If an endeavor to determine from the evidence *any point essential* to the Commonwealth's case, you hesitate as between two conclusions and find yourselves mentally reluctant to reach a conclusion and, *after considering the evidence from all angles you still hesitate,* that is what the law terms a reasonable doubt* and the defendant is entitled to its benefit. . . . The reluctance must not come out of your heart, but it must be one which arises in your minds after consideration of all the evidence."

---

* If anything, the charge on reasonable doubt was more favorable to defendant than is required—See: *Commonwealth v. Donough,* 377 Pa. 46, 51-52, 103 A. 2d 694.

It is worthwhile repeating that the appellant made an oral confession, a written confession, and thereafter participated in a re-enactment of the crime. Of course, he subsequently repudiated, but could not satisfactorily explain, these confessions. His principal, if not sole, defense was that of an alibi, viz., on the evening of the murder he attended a dance in Philadelphia. Thus the paramount issue in the entire case was whether defendant was present at the scene of the crime and whether he participated in the crime as set forth in his confessions and re-enactment of the robbery. Undoubtedly, the issue was clear to the jury and on the basis of the evidence they rendered a verdict of murder in the first degree.

The trial Judge in his charge, covering 56 pages, clearly and with absolute fairness, discussed the testimony of both the Commonwealth and the defendant, including the evidence pertaining to alibi. The Court correctly charged the jury on the subject of "reasonable doubt" and "the burden and measure of proof required for the defense of alibi. On many occasions throughout the charge, the trial Judge stated that the burden was on the Commonwealth to prove the defendant guilty of the crime charged beyond a reasonable doubt and that burden never shifted.* A reading of the entire charge shows clearly that the jury was fairly and adequately instructed and was not misguided with respect to the fundamental proposition that defendant was entitled to the benefit of any reasonable doubt which arose from the evidence.

Defendant contends that the trial Judge committed fundamental error in failing to charge the jury "that the evidence of alibi, may with the other facts in the case, raise a reasonable doubt as to defendant's guilt."

---

* This was in accordance with *Commonwealth v. Donough*, 377 Pa. 46, 51, and cases cited therein.

The trial Judge, at the end of his charge gave defendant the opportunity to call to the Court's attention any omission, correction, or error in the charge. Counsel for defendant made three specific requests, but failed to request any addition to the charge relative to the issue which he now advances concerning alibi. Ordinarily, this failure would be sufficient to bar consideration of this question on appeal: *Commonwealth v. Barnak*, 357 Pa. 391, 54 A. 2d 865. Nevertheless, we shall consider this issue on its merits.

In *Commonwealth v. Jordan*, 328 Pa. 439, 196 A. 10, the Court correctly said (pages 446, 447, 448): "The law is firmly established that the measure of proof required for the defense of alibi is merely a preponderance of the evidence, or, as it is sometimes stated, proof 'to the satisfaction of the jury.' Even if not thus proved, however, the evidence in support of the alibi may, with the other facts in the case, [or may be sufficient of itself to] raise the reasonable doubt of guilt which entitles a defendant to acquittal: Rudy v. Commonwealth 128 Pa. 500, 507, 508; Commonwealth v. Andrews, 234 Pa. 597, 604; Commonwealth v. Delfino, 259 Pa. 272, 279; Commonwealth v. Barrish, 297 Pa. 160, 169, 170, 171; Commonwealth v. Stein, 305 Pa. 567, 570, 571; Commonwealth v. Duca, 312 Pa. 101, 110, 111, 112, 113. . . . 'The law of our State requires specific instructions to be given relative to the burden of proof in an alibi, and the degree of persuasion necessary [by a preponderance of the evidence] to support a conclusion that the accused was not at the place where the crime was committed. . . .' . . . 'The jury should have been informed that the defendant need only prove an alibi by a preponderance of the evidence. This failure was a fatal oversight': Commonwealth v. Trygar, 121 Pa. Super. Ct. 525, 528. See also Commonwealth v. Yancer, 125 Pa. Super. Ct. 352, 354, 356."

*Commonwealth v. Blanchard,* 345 Pa. 289, 26 A. 2d 303, is analogous to and rules the instant case. There the sufficiency of the trial Court's charge concerning defendant's alibi was raised. Mr. Justice (later Chief Justice) STERN, speaking for the Court, said (page 291) : ". . . In regard to defendant's attempt to prove an alibi, the trial judge not only charged that such a defense could be established by the mere preponderance of the evidence, but he added that an alibi 'is the most perfect defense in the world'; *he did not need specifically to state, although it is true, that the evidence offered in support of an alibi may be sufficient of itself to raise a reasonable doubt."*

Notwithstanding isolated excerpts from several decisions which state the law differently or more broadly,* *that is a correct statement of the law.**

---

* For example, in *Commonwealth v. Barnak,* 357 Pa. 391, 54 A. 2d 865, the trial Judge charged the jury, inter alia (page 403) : ". . . 'it will be for you, if you are otherwise convinced of the defendant's guilt beyond a reasonable doubt, to take into consideration the defense of alibi that has been raised by the defendant' . . . 'even though you might find that the alibi does not exclude the possibility of John Barnak having committed the crime, [which was equivalent to saying that if the evidence as to the alibi was not established by a fair preponderance of the evidence] you have the right to use the shortness of time as creating in your mind a reasonable doubt of the defendant's guilt, if the shortness of the time does create such a doubt in your mind.' " In holding the charge free from error, this Court stated (page 413) : "In the instant case the charge was far more favorable to the accused than was the charge in Rudy v. Com., supra, where the trial judge said: 'If he [the defendant] failed to do so [i.e., prove his alibi] to the satisfaction of the jury, the alleged alibi, as a substantive defense, was valueless.' This court held that that was not prejudicial error. In Commonwealth v. Barrish, supra, the trial judge said the jury must ' "carefully scrutinize and weigh the evidence", [of alibi] and if the evidence of alibi is not satisfactory to the jury "the defense of alibi falls completely." ' We held that that did not constitute

Furthermore, what this Court said in *Commonwealth v. Donough,* 377 Pa. 46, 53, is particularly pertinent in this case: "In Com. v. Barnak, 357 Pa., supra, this Court, speaking through Mr. Chief Justice MAXEY, said (page 406) : 'We also said in Commonwealth v. Schurtz, 337 Pa. 405, 411, 10 A. 2d 378: "Isolated excerpts torn from the heart of the charge cannot be considered apart from the context, and if the whole is accurate and fair as it was in this case, the parts objected to do not form a proper basis for reversal." This same principle was enunciated by this Court in Com v. Glenn, 321 Pa. 241, 183 A. 763; Com. v. Becker, 326 Pa. 105, 191 A. 351; Com. v. Stelma, 327 Pa. 317, 192 A. 906.' The same principle was reiterated in Com. v. Patskin, 372 Pa. 402, 422, 93 A. 2d 704; Com. v. Moyer, 357 Pa. 181, 187, 53 A. 2d 736; Com. v. Holley, 358 Pa. 296, 302, 56 A. 2d 546; Com. v. Cargill, 357 Pa. 510, 513, 55 A. 2d 373; Com. v. Almeida, 362 Pa. 596, 600, 68 A. 2d 595."

Defendant cites two prior decisions of this Court to support his contention that the charge constituted reversible error: *Commonwealth v. Mills,* 350 Pa. 478,

---

prejudicial error." This Court also stated in a footnote on pages 406-407:

"While this court has approved instructions in homicide cases to the effect that when an alibi is set up the defendant must, in order to have it avail him, prove it by a fair preponderance of the evidence, yet if the evidence in support of his alibi falls short of being preponderating evidence but does raise a reasonable doubt of his guilt he must be acquitted, such instructions constitute an anomaly which it would be well if trial judges would hereafter not repeat. . . . It would be better if the jury was instructed, when the defense of an alibi is set up, that the burden remains on the Commonwealth to prove every essential element of the case, including the defendant's presence at the scene of the homicide when, as in the instant case, that is a material element in the case."

39 A. 2d 572, and *Commonwealth v. New,** 354 Pa. 188, 47 A. 2d 450. These are distinguishable from the instant case.

In *Commonwealth v. Mills,* 350 Pa., supra, the charge with respect to alibi was ambiguous and for this reason misleading and prejudicial, and solely because of this a new trial was granted.

In *Commonwealth v. New,* 354 Pa., supra, (a) because the charge of the trial Court was so inaccurate and misleading, and (b) also because the Commonwealth's evidence was so weak and the evidence of alibi was so strong, this Court said (page 214) : "The jury *must* also be instructed* that 'the evidence in support of the alibi may, with other facts in the case, raise the reasonable doubt of guilt which entitled a defendant to acquittal.' "*   The opinion of this Court *was predicated upon the failure* of the trial Judge to "make it clear to the jury that the evidence as to an alibi may generate in the minds of the jury a reasonable doubt of the defendant's guilt." The trial Judge's charge in that case was filled with statements which, because of inaccuracy or ambiguity, were highly prejudicial, and the language of this Court's opinion must be considered in connection with the facts of that case.

If it is impossible to reconcile all the prior decisions in Pennsylvania, on this narrow but important point, we reiterate that the accurate statement of the law

---

* That is too broad a statement of the law, although it was correct if applied and limited to that case. However, it was repeated in *Commonwealth v. Kettering,* 180 Pa. Superior Ct. 247, 119 A. 2d 580; and in a footnote to *Commonwealth v. Noble,* 371 Pa. 138, 88 A. 2d 760; Cf. *Commonwealth v. Johnson,* 372 Pa. 266, 283, 93 A. 2d 691.

* See footnote on previous page.

is that which is laid down in *Commonwealth v. Blanchard,* 345 Pa., supra.

The trial Court's charge to the jury considered in its entirety correctly sets forth the law as to alibi, and the burden of proof of the Commonwealth, which never changes, of proving that the defendant was guilty of the crime charged beyond a reasonable doubt. We find no reversible error.

Judgment and sentence affirmed.

---

DISSENTING OPINION BY MR. JUSTICE MUSMANNO:

The defendant in this case denied he was guilty of the crime of murder with which he was charged and introduced evidence that he was elsewhere at the time the murder was being committed, that is to say, he advanced an alibi. In criminal cases there is no defense superior to an alibi. Despite the lightning-challenging speed of jet planes, missiles, and moon-bound rockets, it is still unhinged fantasy to assume that a human being may occupy two different points of geography at one and the same time. Although colloquially the word *alibi* is sometimes used flippantly to suggest something less than utter factuality, it has never, in the law, lost any of its grave and solemn significance, and it behooves judges and prosecuting attorneys to so treat it, regardless of their own personal feelings in the matter.

Jerold Richardson, the defendant here, testified that at the time, according to the Commonwealth's testimony, the murder of Roy Wunder was being committed in a taproom on the Baltimore Pike, Springfield, Delaware County, he, Richardson, was miles away in Philadelphia attending a dance, later visiting at a restaurant, and then finally resting at his home.

A soldier in the United States Air Corps, Ernest M. Greaves, testified that he was constantly with the defendant during the time related; that is to say, he corroborated the alibi. Thus, the alibi was seriously advanced and, considering that the defendant's very life was at stake, it was entitled to serious consideration. It failed to receive that consideration at the hands of the Trial Judge.

Richardson was convicted of murder in the first degree and sentenced to life imprisonment. He asks for a new trial, complaining that the Trial Judge incorrectly instructed the jury on the law of alibi. This Court has refused a new trial and, for the reasons hereinafter to be set forth, I dissent.

The Majority Opinion of this Court devotes considerable space to the evidence presented by the Commonwealth to prove Richardson's guilt. Richardson could be as guilty as Jesse James and yet be entitled to a correct exposition of the law. The legal rope which hangs a guilty person should be strong enough to save an innocent person from drowning in the rapids of an unjust accusation. To approve the fallacy-laden charge of the Trial Judge in this case is to jeopardize the life and liberty, regardless of guilt or innocence, of every defendant of the future who pleads not guilty on the basis of an alibi.

The charge of the Trial Court completely missed the mark on the most important item in the case, on the side of the defendant. It adjusted its sights and aimed conscientiously but took its eye off the target when discharging the shot. Here is what the Trial Judge said on the law of alibi: "Now on the other hand there has been not only a denial in this case from the witness stand that this defendant participated, but there has been something else brought up in the defendant's case as an affirmative defense, and that is

the question of alibi; because if this defendant convinces you by a fair preponderance of the evidence—not beyond a reasonable doubt, he does not have that burden, but if he convinces you by the weight of the evidence, by a fair preponderance, the balancing of the scales in his favor, that his alibi is true, then of course, he could not have been at the place where he is said to have been by the Commonwealth, he would have been at another place and he could not have committed this crime.

"I say to you that an alibi, if believed, is a very strong piece of evidence in favor of a defendant to show his innocence. However, I will charge you more fully on alibi a little later in the charge, reading the law to you.*

"So that the Commonwealth's burden, in order to convince you of the defendant's guilt is beyond a reasonable doubt that they must convince you; the defendant, on the other hand, in interposing an affirmative defense such as alibi, need only raise the issue by a fair preponderance of evidence."

It will be noted that the Judge said that he would charge "more fully on alibi a little later in the charge," but the remainder of the charge, so far as law on alibi is concerned, reveals only the background of an empty sky. The target has disappeared completely. The jury is left to assume, either that the alibi was not worth considering or that what had already been said by the Court on the subject was enough.

I must confess to sheer amazement that the Majority Opinion, in quoting from the Trial Judge's charge, omitted (as I have already indicated in a footnote), the

---

* The Majority Opinion has omitted this paragraph from its reproduction of the Court's charge on alibi.

very paragraph which is the heart of the case. How can the Majority dispose of an appeal when it ignores the major complaint? The Majority's omission in this respect is like a doctor who examines an injured person, makes notes of bruises, lacerations and abrasions, but overlooks completely the fact that the injured man has a broken leg!

Since the omitted paragraph is practically the alpha and omega of the appeal, I will repeat it. This is what the Trial Judge said: "I say to you that an alibi, if believed, is a very strong piece of evidence in favor of a defendant to show his innocence. However, I will charge you more fully on alibi a little later in the charge, reading the law to you."

In making such a statement the Trial Judge misled the jury in two ways. He not only failed to say what it was indispensable to say, but what he did say, was wrong. Thus: "I say to you that an alibi, if believed, is a very strong *piece* of evidence in favor of a defendant to show his innocence."*

What is a piece? It is a part, it is a fragment of the whole, it is one of numberless little stones which go to make up a mosaic, it is a single leaf on a tree, it is a selected paragraph in a book, it is a solitary pebble on the beach, it is an individual note in a symphony. But an alibi is more that that. It is the *whole* tree, the *whole* symphony, the *whole* beach. So far as charges brought against a defendant are concerned, an alibi accepted as true presents a suit of mail against accusing arrows, it is a brick and iron fort against an incriminating blunderbuss, it is a steel umbrella warding off the rain and the storm of accusation. An alibi is not a "strong piece of evidence." It is a *complete* defense. An alibi, if believed, is unassail-

---

. * Italics throughout, mine.

able, bulletproof, watertight, invulnerable—impregnable. To say to a jury that an alibi is a strong piece of evidence is to say that it can be overwhelmed by stronger evidence, but there is no stronger evidence than a credible alibi.

The Majority attempts to repair the big hole in the Judge's charge by speaking of other things. It relates how perfectly the Judge charged on reasonable doubt, how excellently he reviewed the evidence, how impeccably he instructed the jury on the burden of proof, but, after all its explanation, the gaping failure of the Judge's charge on alibi stands out like a jagged wound in the hull of a ship which extends from the main deck to the keel, a wound which no patchwork can heal and which, if sustained far enough away from land, can only take the ship to the bottom of the sea.

The loose thread in the Judge's instructions cannot be rewoven into the fabric of a perfect charge and it is no answer to say that the lawyer failed to call the imperfection to the Judge's attention at the end of the charge. If the lawyer overlooked or forgot to remind the Judge, what did the Judge do when he said: "I will charge you more fully on alibi a little later," and then forgot about it? Is the lawyer, with all the worries of an accused man's life on his hands to be held to a higher standard of awareness than the judge who is accepted as the repository of wisdom and the apogee of intellectual alertness? Why did not the Judge do what he said he would do? Unless the Majority can explain the Judge's omission in this regard, it cannot in fairness convict the lawyer of omission in performance of duty. Moreover, the Judge's mistake was so basic and fundamental that the general exception taken by defendant's counsel at the end of the charge fully protected the rights of the defendant. What this Court stated in the case of

*Patterson v. Pittsburgh Rys. Co.*, 322 Pa. 125, 128, is still good law: "It is true defendant took only a general exception to the charge, but where, as here, the case calls loudly for such instructions, the failure to give them must be regarded as basic and fundamental error. Inadequacy of a charge may be taken advantage of on general exception where the instructions omitted are vital to a proper conception by the jury of the fundamental principles of law involved (DiPietro v. Great Atlantic & Pacific Tea Co., 315 Pa. 209), and the inadequacy is just as basic where, in a case like the present, the legally established methods of determining the factual question involved are not explained to the jury. Indeed, even in the absence of a general exception, the appellate court of its own motion may reverse because of basic and fundamental error: Schmitt v. City of Phila., 248 Pa. 124; Marlowe v. Travelers Insurance Co., 313 Pa. 430."

The Majority Opinion says: "Defendant contends that the trial Judge committed fundamental error in failing to charge the jury 'that the evidence of alibi, may with the other facts in the case, raise a reasonable doubt as to defendant's guilt.' " The Majority then submits that the failure of the Judge to so charge does not entitle the defendant to a new trial because, aside from the fact that he made no objection to the omission, it was not required that he have that particular instruction. In support of this contention the Majority cites and quotes from *Commonwealth v. Jordon*, 328 Pa. 439, and *Commonwealth v. Blanchard*, 345 Pa. 289, but neither of these cases supports the Majority's position. On the contrary, they are devastating authority to the contrary. In the *Jordan* case this Court said: "Even if not thus proved, [that is, the alibi], however, *the evidence in support of the alibi may, with the other facts in the case raise the reason-*

*able doubt of guilt which entitles a defendant to acquittal.*" Is this not exactly what the defendant contends, and is this not exactly what the Trial Judge failed to charge?

In the *Blanchard* case this Court said: "In regard to defendant's attempt to prove an alibi, the trial judge not only charged that such a defense could be established by the mere preponderance of the evidence, but he added that an alibi '*is the most perfect defense in the world*'; he did not need specifically to state, although it is true, that the evidence offered in support of an alibi may be sufficient of itself to raise a reasonable doubt." Commenting on this statement, the Majority says that "this is a correct statement of the law." But it is particularly to be noted that in the *Blanchard* case the Trial Judge said that an alibi "is the most perfect defense in the world." But the Trial Judge in the case at bar did not approach the remotest suburbs of saying that an alibi is the most perfect defense in the world. Contrarily, his discussion on the subject produced the impelling inference that if there was anything in the world which lacked perfection, it was precisely Richardson's alibi.

The question of how to charge where alibi evidence is involved is not a new one. This Court has spoken on the subject many times. One of the landmarks in this respect is the case of *Commonwealth v. Mills*, 350 Pa. 478, which the Majority Opinion dismisses at the door. In that case the defendant was charged with murder and his defense was an alibi. The Trial Judge charged: "While the Commonwealth is required to establish the guilt of the defendant beyond a reasonable doubt, all that the defendant is required to do is to establish his alibi by the fair weight or preponderance of the evidence. In other words, the evidence offered by him and his witnesses, in support of his

contention that he was at home, in bed, or preparing to go to bed, at the exact time that this shooting took place, must be such, in your minds as fair and reasonable men and women, that it outweighs the evidence produced by the Commonwealth."

This Court held, unanimously, that such a charge was inadequate and ordered a new trial. Chief Justice MAXEY, speaking for the Court, said: "If the testimony the defendant offered in support of his alibi raised a reasonable doubt in the jurors' minds as to the defendant's presence at the scene of the homicide he was entitled to an acquittal."

Nowhere in the case at bar did the Trial Judge say that the alibi of itself could raise a reasonable doubt which could entitle the defendant to an acquittal. All he said was that an alibi is a piece of strong evidence. But *strong* is a relative expression. A cat is strong as against a mouse, but in the jaws of a mastiff a cat is no stronger than the mouse was strong.

Reviewing the authorities in the *Mills* case, Chief Justice MAXEY, said: "In Rudy v. Commonwealth, 128 Pa. 500, 18 A. 344, Justice STERRETT speaking for this court, said of the charge of the lower court in that case that 'it constitutes a full, clear and accurate statement of the law on that subject. The burden of proving it was clearly on the prisoner. If he failed to do so to the satisfaction of the jury, the alleged alibi, as a substantive defense, was valueless; but that did not deprive him of the benefit of his evidence on that subject, so far as it, *in connection with other testimony in the case, may have had a tendency to create a reasonable doubt as to his guilt.*"

It could happen in a criminal case that two sets of witnesses, apparently equally credible, could testify to conflicting accounts as to the defendant's presence at or absence from the place of the crime at the time

it was committed, and the jury could conclude that the defendant had not established by the preponderance of the evidence that he was not at the scene of the crime when it occurred. However, it could be that in another part of the trial a question arose as to whether the Commonwealth had proved, as it contended, that the money found on the defendant was the money which had been taken from the victim of the crime. In such a case, even though the jury did not implicitly accept the alibi, the evidence on the alibi could, joined to the evidence on the money, raise a reasonable doubt which would work an acquittal. This kind of a situation could well come within the legal proposition announced by Justice KEPHART (later Chief Justice) in the case of *Commonwealth v. Barrish,* 297 Pa. 160, namely, "Where one is accused of having committed a crime and from *all the proof submitted,* including the evidence as to the alleged alibi, a doubt exists in the jury's mind as to whether the accused was at the scene of the homicide at the time of the commission of the crime, this may be enough to warrant acquittal because of a reasonable doubt of guilt."

The Majority offers no more hospitality to the case of *Commonwealth v. New,* 354 Pa. 188, 214, than it did to *Commonwealth v. Mills.* But the *New* case is one not to be driven from the doorstep like a vagrant. It announces a principle, which, so far as I have been able to determine, this Court has never in the past deviated from, namely, "The jury *must* also be instructed that 'the evidence in support of the alibi may, with other facts in the case, raise the reasonable doubt of guilt which entitles a defendant to acquittal'."

It must be particularly noted here that the Court says, not that the Trial Judge *may* charge that the alibi evidence could with other evidence in the case raise a reasonable doubt; it says that the jury *must* be

so instructed. Nor was this mandate handed down in the dim and dust-covered days of an ancient past. It was said in 1946 and therefore postdates the *Blanchard* decision. Not that I see anything in the *Blanchard* case which would acquit the charge in this case of error.

If this Court intends to repudiate and overrule the established law on the subject of alibi, it has the authority and the power to do so. I do not see the necessity for such a change; I do not see the wisdom of such a change; I do not see how it can justify such a change in the case at bar without committing the sin of ex post factoism, and I do see here a definite harm to the guarantees of liberty; I see here a depriva·tion of rights under trial by jury as it has come down through the centuries; and I accordingly energetically

Dissent.