543 A.2d 1210

**COMMONWEALTH of Pennsylvania**

v.

**Paul E. GILLY, Appellant.**

Superior Court of Pennsylvania.

Submitted March 28, 1988.

Filed June 8, 1988.

Mark F. Geary, Pittsburgh, for appellant.

Paul M. Petro, Assistant District Attorney, Donora, for Com., appellee.

Before OLSZEWSKI, WATKINS and HOFFMAN, JJ.

OLSZEWSKI, Judge:

This case comes before us following the denial of a petition for relief brought pursuant to the Post Conviction Hearing Act, 42 Pa.C.S.A. §§ 9541–9551 (hereinafter "PCHA"). Finding no merit in this appeal, we affirm the order.

On March 2, 1972, petitioner Paul Gilly was convicted by a jury of three counts of murder for his participation in the brutal deaths of Jock Yablonski, his wife, and daughter in December of 1969. Following his conviction, petitioner filed a post-trial motion for a new trial, which was denied on September 29, 1972. Sentencing was delayed, however, while Gilly cooperated with the Commonwealth in the prosecution and conviction of two individuals who took part in the murders—W.A. "Tony" Boyle and William Prater. Finally, on September 3, 1976, Gilly was sentenced to three concurrent life sentences. No motion to modify the sentence was filed, and no direct appeal was taken from the judgment of sentence.

In July of 1982, Gilly filed a PCHA petition claiming he was denied his rights to a fair trial by jury and to the effective assistance of trial counsel. Petitioner also claimed the trial court erred in refusing to grant him a change of trial venue. According to the record, neither the court nor the Commonwealth acted upon the petition. An order was

entered, however, on November 29, 1984, granting Gilly's request to withdraw the PCHA petition.[1]

On January 9, 1987, Gilly filed this second PCHA petition raising three claims: (1) the trial court erred in denying the request for a change of venue; (2) the "key-man" jury selection process was not fair; and (3) because the prosecuting attorney, Richard Sprague, failed to abide by his promises to Gilly regarding a sentence recommendation, he should be compelled to fulfill his part of the alleged sentencing agreement. In May of 1987, Gilly filed an amended PCHA petition claiming the sentencing court failed to inform him of his appellate rights as provided by Pa.R. Crim.P. 1405(b).[2] A hearing was held on the matter on May 13, 1987. By means of a comprehensive opinion and order dated July 31, 1987, the PCHA petition was denied. This timely appeal followed.

■ One question is raised for our consideration: because petitioner was not informed of his right to appeal at the time of sentencing, should he be permitted to appeal nunc pro tunc?

An accused enjoys a virtually unqualified right to appeal a judgment of sentence. In determining the scope of this appellate right, this Court has recently stated:

1. Appellant then sought relief in federal court by means of a petition for writ of habeas corpus. That petition was apparently dismissed for failure to exhaust state remedies.

2. At the time of Gilly's sentencing, Rule 1405 provided in relevant part as follows:

   **Rule 1405. Sentencing Proceeding**
       At the time of sentencing, the judge shall:
       (b) advise the defendant of his right to appeal and the time within which he must exercise such right and, if he is indigent, of his right to proceed in forma pauperis and to be provided free counsel. Pa.R.Crim.P. 1405(b), adopted July 23, 1973, effective in 90 days; amended and effective June 30, 1975.
       Paragraph (b) has been retained but is now designated as paragraph (c) under the current rule. Interestingly, present Rule 1405(c) requires that the sentencing court "advise the defendant *on the record*" of his appellate rights. The underscored language was not included in former Rule 1405(b).

It is axiomatic that in our scheme of justice an accused has the right to appeal his sentence [an accused has an absolute right to appeal pursuant to the Pennsylvania Constitution, Art. V, Sec. 9] and to the assistance of appointed counsel, if indigent, in doing so, *Douglas v. California*, 372 U.S. 353, 83 S.Ct. 814, 9 L.Ed.2d 811 (1963). Concomitantly, the accused has the ability to "waive" his right to counsel and to an appeal. As our Supreme Court capsulized in *Commonwealth v. Norman*, 447 Pa. 217, 285 A.2d 523 (1971):

> In determining whether a defendant has waived a constitutional right it is well settled that the federal standards of waiver first enunciated in *Johnson v. Zerbst*, 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461 (1938) apply. A waiver of a constitutional right must be "an intentional relinquishment or abandonment of a known right or privilege." 304 U.S. at 464, 58 S.Ct. at 1023. The presumption must always be against the waiver of a constitutional right. *Glasser v. United States*, 315 U.S. 60, 70–71, 62 S.Ct. 457, 463–465, 86 L.Ed. 680 (1942). Nor can waiver be presumed in a silent record case. The United States Supreme Court explicitly ruled in *Carnley v. Cochran*, 369 U.S. 506, 82 S.Ct. 884, 8 L.Ed.2d 70 (1962): *"Presuming waiver from a silent record is impermissible.* The record must show, or there must be an allegation and evidence which show, that an accused was offered counsel but intelligently and understandingly rejected the offer. Anything less is not waiver." (Emphasis added).

*Id.* at 516, 82 S.Ct. at 890. Thus this Court is constitutionally bound to place the burden of proving waiver on the Commonwealth. Whether defendant was represented by private or court-appointed counsel, or whether his trial took place before or after the *Douglas* decision, are distinctions with no legal significance. *Commonwealth v. Ezell*, [431 Pa. 101, 244 A.2d 646 (1968)]; *Commonwealth ex rel Stevens v. Myers*, [419 Pa. 1, 213 A.2d 613 (1965)].

447 Pa. at 221–222, 285 A.2d at 526.... Furthermore, the Commonwealth's burden of proving waiver of one's appellate rights by a preponderance of the evidence, in silent record cases, has been settled law in this jurisdiction since 1968. *Commonwealth v. Wilson*, 430 Pa. 1, 241 A.2d 760 (1968).

*Commonwealth v. Waring*, 366 Pa.Super. 144, 146–47, 530 A.2d 933, 934–935 (1987) (Olszewski, J.), *quoting, Commonwealth v. Berthesi*, 350 Pa.Super. 383, 387–88, 504 A.2d 891, 893–94 (1986).

Instantly, we acknowledge that the sentencing court failed to inform petitioner of his constitutional right to appeal the judgment. We agree with the learned PCHA court, however, that Gilly was afforded his right to appeal as provided in Rule 1405.

It is particularly important to review the unique circumstances of this case. In 1972, after the verdict of guilty was returned, Gilly received a sentence of death for his participation in the crimes. Later that same year, the Supreme Court of Pennsylvania in *Commonwealth v. Bradley*, 449 Pa. 19, 295 A.2d 842 (1972), adopted the interpretation of the Supreme Court of the United States in *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), which declared that the death penalty as it was being applied was unconstitutional. Thereafter, Gilly's sentence of death was vacated. He subsequently cooperated with the prosecution and testified under oath at the trials of two other participants in the murders, Prater and Boyle. In the interim between the verdict and sentencing, another participant in the murders, Aubran Wayne Martin, filed post-trial motions raising claims identical to those made by Gilly, i.e., challenges to the "key-man" jury selection process and the pre-trial order denying a change of venue. Unlike Gilly, however, defendant Martin appealed the denial of the post-trial motions; and on November 26, 1975, the Supreme Court of Pennsylvania affirmed his conviction.[3] Important-

---

3. *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975), *cert. denied, Pennsylvania v. Martin,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d

ly, in a letter dated November 5, 1974, to the prosecutor in Gilly's case, petitioner's counsel acknowledged awareness of Martin's pending appeal.

Most revealing are petitioner's statements before the sentencing court in September of 1976:

> "I know it's a little late to say it, but I'm sorry for any part I had in this. I'm truly sorry. I'm not sorry I'm here, but I'm sorry for what I did, for any part I had to do in it. If there was anyway possible even with my life, I would want the people back."

Opinion of PCHA court 7/21/87 at 10, *quoting*, sentencing transcript at 6. Immediately thereafter, petitioner's privately retained trial counsel, Gerald S. Gold, addressed the court, emphasizing that Gilly had cooperated with the prosecution. In the presence of the remorseful defendant, the trial court responded to Mr. Gold as follows:

> It is, of course, remembered that [petitioner] did not take the stand and perjure himself by denying what he has now admitted he did. *I assume it is not your intention to make any further motions in this matter?*
>
> Mr. Gold: *Not in regard to this matter, no, Your Honor.*
>
> The Court: *You have his authority for saying that?*
>
> Mr. Gold: *Yes, sir.*

*Id.*, *quoting*, sentencing transcript at 7–8.

After reviewing the record, we are in full agreement with the reasoning of the PCHA court:

> Gilly knew that [defendant] Martin had unsuccessfully appealed his convictions. Gilly knew that the death sentences imposed on Martin had been set aside by the Supreme Court. Gilly knew that many of the other issues decided against Martin were issues identical to his

1226 (1976). Martin's sentence of death was also vacated on the basis of *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), and *Commonwealth v. Bradley*, 449 Pa. 19, 295 A.2d 842 (1972).

own: pre-trial publicity, death qualified jury, the key-man jury, and change of venue. Gilly had been through extradition proceedings in Ohio and pre-trial hearings here. He had filed extensive post-trial motions. Then he admitted his involvement in the murders and had given testimony on the details of what he had done under oath on at least two occasions. There is no doubt that he was aware of the system and how it worked. So that when Judge Sweet asked [defense attorney] Gold if he had Gilly's authority to say that no further motions would be filed, we can say now that the protection provided by Pa.R.Crim.P. 1405 was afforded Paul Gilly.

PCHA opinion at 12. Additionally, we note that at no time during the PCHA hearing did petitioner either protest the sentencing court's actions or present testimony regarding that claim. Based upon record before us and for the reasons set forth above, we are satisfied that petitioner was not only aware of his right to appeal, but also that he waived his right and instructed defense counsel to that effect.[4]

Even if we were to find that petitioner was denied his right to appeal, we would, nonetheless, affirm the judgment on direct review. In *Commonwealth v. Miranda*, 296 Pa.Super. 441, 442 A.2d 1133 (1982) (*en banc*), this Court explained that once it is determined a PCHA petitioner has been denied his appellate rights, an appeal nunc pro tunc should be granted if the claims raised in the PCHA petition were presented to the PCHA court and an evidentiary hearing held thereon. Assuming that Gilly has been denied his appellate rights as provided by Rule 1405, we may review this matter as a nunc pro tunc appeal because an adequate record is before us. *See Commonwealth v. Markle*, 368 Pa.Super. 142, 533 A.2d 756 (1987); *Commonwealth v. Dockins*, 324 Pa.Super. 305, 471 A.2d 851 (1984);

4. Although the sentencing court did not explicitly advise petitioner of his appellate rights, this is not the case where the defendant was not aware of those rights and where the record is silent as to whether the waiver of those rights was valid. *Cf. Berthesi, supra.*

*Commonwealth v. McKnight,* 311 Pa.Super. 460, 457 A.2d 1272 (1983).

The first issue raised by appellant is a challenge to the "key-man" jury selection process in effect in Washington County.[5] The Supreme Court explicitly rejected an identical claim in *Commonwealth v. Martin,* 465 Pa. 134, 348 A.2d 391 (1975), *cert. denied, Pennsylvania v. Martin,* 428 U.S. 923, 96 S.Ct. 3234, 49 L.Ed.2d 1226 (1976). On the basis of *Martin,* we find no merit in appellant's first claim.

■ Appellant next claims the pre-trial motions court improperly denied his motion for a change of venue due to extensive publicity. Again, we disagree.

" 'It is clearly established that the grant or refusal of a change of venue or of a continuance is within the sound discretion of the trial court.' " *Commonwealth v. Martin,* 465 Pa. at 147, 348 A.2d at 398, *quoting, Commonwealth v. Richardson,* 392 Pa. 528, 540, 140 A.2d 828, 835 (1958). Three factors are of particular relevance in making this determination: "the length of time between arrest and trial; the effort of the trial court to abate publicity; and whether publicity had caused prospective jurors to form an opinion of guilt." *Martin,* 465 Pa. at 147, 348 A.2d at 398.

Instantly, a period of over two years passed between the time the crimes were committed and the commencement of trial. According to the trial court, media "coverage ha[d] been bland, moderate, sensible and restrained." *Commonwealth v. Gilly,* 53 Wash.Co.Rep. 29, 30 (1972). Further, the record shows that 159 of 250 prospective jurors were extensively questioned over the course of four days; only five individuals evidenced a fixed opinion as to the guilt of Gilly, and these individuals were excused. As the trial court noted, "[e]very juror selected was able to assure Mr. Gold, under cross, that he would give the defendant a fair trial, would accept the presumption of innocence, the rule of reasonable doubt, give weight to character testimony, had

5. We note that this issue was also raised before the trial court in appellant's post-trial motion.

no fixed opinion and no reservations whatsoever." *Id.* Under such circumstances, we are satisfied that appellant has not established that a fair and impartial jury could not be impaneled.[6]

In his final claim, appellant contends the former special prosecutor, Richard Sprague, has reneged on his promises under the "plea bargain agreement" that appellant would serve only seven to nine years' imprisonment, and thus, that Mr. Sprague should be compelled to uphold his part of the bargain.

The PCHA court summarized the testimony at the PCHA hearing as follows:

> Gilly says he was promised by Mr. Sprague that he would receive one life sentence. (He received three concurrent life sentences.) He says that Sprague promised he would serve no more than 7 to 9 years. There is some reference that he would get the same sentence given Annette Gully and Silous Huddleston. (Neither Annette nor Silous stood trial. Both pled guilty and cooperated with the prosecution. They each served some time and were later placed in the federal witness protection program.)
>
> According to Paul Gilly these promises were made to him in Erie County on the eve of the Prater trial. Mr. Sprague categorically denies that he made any promises to Gilly. He says that while Gilly's testimony against Prater was helpful, that Gilly did not testify against Pass or in the second Boyle trial and that it was a witness named Turnblazer whose testimony led to the conviction of W.A. Boyle.
>
> To support Paul Gilly's allegations here, his brothers, William E. Gilly, Robert Gilly and Earl Gilly all appeared and testified in the post-conviction hearing. William E.

6. *Cf. Commonwealth v. Wheeler*, 518 Pa. 103, 112, 541 A.2d 730, 735 (1988) ("The constitutional mandate for a fair and impartial jury is satisfied if prospective jurors are capable of casting aside any impressions or opinions they may have and rendering a verdict based solely upon the evidence presented at trial").

Gilly says Sprague contacted him to see if he could talk with his other brothers in order to persuade Paul to cooperate. Sprague denied contacting William. His testimony was that Paul's mother was ill and William made a request to visit Paul in prison which Sprague arranged. William, Robert and Carl Gilly met with Paul at the Western Penitentiary in Pittsburgh and later that day with [defense] Attorney Rodgers. Mr. Sprague says that he was told after that meeting with Paul and his brothers that Paul wanted to cooperate and arrangements were made for Paul and his counsel, Samuel L. Rodgers, Esq., to come to Erie.

On a Sunday evening at a Holiday Inn in Erie, Pennsylvania, we find assembled Mr. Sprague, his assistants, Mr. Wolfe and Ms. Higgins, Paul Gilly and his three brothers, Samuel L. Rodgers, Paul's attorney, and members of the F.B.I. and the Pennsylvania State Police.

According to Paul, he agreed to testify if he "got something." Sprague responded: "Take him back." Paul says he then offered to implicate Boyle; Sprague said, "Good;" that a discussion ensued in which Sprague offered one life sentence and prison time of 7/9 years in a safe prison. Gilly says Sgt. Dugan of the Pennsylvania State Police was present.

The only witness to corroborate [sic] this testimony is Robert Gilly. He says Sprague offered Paul one life sentence, actual service of 7/9 years and the same "thing" Annette and Silous received. Sprague was heard by Robert to say that the court would do as he instructed it. On that basis Robert says, Paul agreed to testify.[4]

In his testimony, Mr. Sprague said that his policy is "no deal with killers." For example, he refused to make a deal with Claude Vealey whose confession broke the case. Sprague says that it dilutes the process to deal with killers. He says he is willing to make recommendations at the time of sentence based on the degree of cooperation.

According to Mr. Sprague when Paul arrived in Erie, his attorney attempted to negotiate a deal in exchange for his client's testimony. Sprague says he refused but offered to make appropriate recommendations at sentence. Both Attorney Rodgers and Paul said there would be no cooperation without a deal, to which Sprague said, go back to Pittsburgh. Gilly then said that he would cooperate. He was afforded his Miranda rights; asked if he had participated in the killings [sic]. Upon his affirmative response, he was turned over to the F.B.I. with his counsel. Mr. Sprague withdrew and a complete statement was given to his interrogators. According to Sprague, part of Gilly's statement to the F.B.I. was that he had overheard a conversation between Prater and Huddleston in which it was said that W.A. Boyle was involved. Sprague says that Gilly testified against Prater and said in that trial under oath and in the presence of his own counsel that no deal was made for his testimony. (We are told such reference can be found on page 281 of the Prater trial transcript.) Additionally, Paul Gilly in his testimony at the first trial of W.A. Boyle testified that no deal has been made for his testimony.

Finally, at the Post–Conviction Hearing, Sgt. Robert Dugan of the Pennsylvania State Police testified that he was in the motel room in Erie during the entire meeting between Sprague, Paul Gilly, and the others. He says no discussion took place regarding an agreement that Gilly would serve only 7/9 years.

[4] Attached to the Post–Conviction Hearing Petition is a Memorandum prepared by Samuel L. Rodgers, Esquire. In it, counsel outlines the steps which led to Paul Gilly's decision to turn state's evidence. It is explicitly noted therein that the "deal" which Paul Gilly testified to was no more than a "tactic understanding." It was agreed that Attorney Rodgers took the stand in some later proceeding and clearly stated that the Memorandum which he prepared was not written to memorialize a "deal" or agreement, and that in fact none existed. We agree that the Memorandum is not evidence of an agreement.

PCHA opinion at 14–17 (footnote in original).

Having carefully reviewed the transcripts of the sentencing and the PCHA hearings, we conclude that appellant's

claim has no basis in law or fact. At no time before either the PCHA court or this Court has appellant cited authority for his underlying proposition that the prosecution may be forced to abide to the terms of an alleged agreement regarding a sentencing recommendation.[7] Importantly, we note that this is not a case involving the Commonwealth's failure to abide by the terms of a *plea bargain* agreement; Gilly did not enter a plea to the charges, but rather, was convicted by a jury before deciding to cooperate with the prosecution.

Further, even if petitioner's claim was recognized, nothing in the record supports appellant's assertion that he and Mr. Sprague entered into a "bargain" in regard to the sentence. Rather, the record reveals that appellant invoked his constitutional right to a trial by jury and, after being convicted, admitted his guilt and agreed to cooperate with the prosecution with the *hope* that the prosecutor would make a favorable sentencing recommendation.[8] The record discloses that Mr. Sprague made a favorable recommendation and, accordingly, a sentence of three concurrent life sentences was imposed.[9] Under such circumstances, appellant's claim of error has no basis.

Order affirmed.

HOFFMAN, J., concurs in the result.

7. We note that appellant does not assert a constitutional challenge.

8. We are particularly persuaded by defense counsel's recollection that no more than a general "tactic understanding" existed between the defense and the prosecution regarding Mr. Sprague's sentencing recommendation. We also note that the principals were at odds regarding the existence of an alleged "plea agreement." Hence, the question of whether an agreement existed was one requiring a determination as to the credibility of the witnesses.

9. In contrast, W.A. "Tony" Boyle received three consecutive life sentences for his involvement in the crimes.