348 A.2d 391

**COMMONWEALTH of Pennsylvania**

v.

**Aubran Wayne MARTIN, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 8, 1974.

Decided Nov. 26, 1975.

136

138

140

Mark J. Goldberg, Pittsburgh, for appellant.

Jess D. Costa, Dist. Atty., Washington, Richard A. Sprague, Sp. Prosecutor (Asst. Dist. Atty., Philadelphia), for appellee.

Before JONES, C. J., and EAGEN, O'BRIEN, ROBERTS, POMEROY, NIX and MANDERINO, JJ.

OPINION

POMEROY, Justice.

In the early morning of December 31, 1969 Joseph Yablonski, his wife Margaret and their daughter, Charlotte were shot to death as they slept in their home in Clarksville, Washington County, Pennsylvania. Approximately a month later Aubran Wayne Martin, the appellant, was arrested in Ohio and charged with the murders. After extradition to Pennsylvania he was tried by a jury and on November 12, 1971 was found guilty of three counts of murder in the first degree. The jury recommended that the death penalty be imposed. Post-trial motions were denied in September, 1972 by the court en banc. A year later the sentence of death was imposed on appellant on each of the three counts. This appeal followed.

It is not necessary for purposes of this opinion to give a detailed recitation of the sordid facts surrounding these murders. Various factual aspects of the crimes will be mentioned hereinafter as the discussion of the legal issues warrants. Suffice it here to recount that Joseph Yablonski was a stormy petrel in the United Mine Workers of America who in 1969 waged a vigorous but losing campaign for the presidency of that organization.

Claude Edward Vealey, Paul Gilly and Aubran Wayne Martin were hired to assassinate Yablonski for the sum of $5,200.[1] Martin was a late substitute in this conspiracy for one James Phillips, who had withdrawn after he, Vealey and Gilly had spent some months in seeking, unsuccessfully, the right opportunity for the assassination. The principal evidence against Martin came from the testimony of his co-conspirator Vealey; evidence filling out and corroborating his story came from federal and State law enforcement personnel, and others. According to Vealey, Martin entered the room of Charlotte Yablonski and shot her twice with a .38 caliber revolver, killing her. Immediately thereafter Vealey, in an adjacent bedroom occupied by Mr. and Mrs. Yablonski, tried to shoot them, but his rifle jammed and the clip fell to the floor. Gilly came to his aid, fixed the rifle, and fired once at the Yablonskis. Martin also entered the Yablonski bedroom and fired four times at Jock and Mrs. Yablonski. Vealey then took Martin's revolver and for good measure shot Yablonski three more times. It was Martin, according to his companions, who took a money clip containing about $240 dollars from the bedroom dresser, which later was split among the three. Their mission accomplished, the murderers left the scene, and on their return journey discarded weapons, ammunition, gloves and stolen film canisters in the Monongahela River and along the road-

1. Appellant, who testified on his own behalf, denied he was so hired; his version of the episode was that he agreed with Vealey, with whom he had committed a number of prior burglaries, to steal a valuable collection of coins in Tennessee for a guaranteed payment to him of $2,000; that the Pennsylvania site of the proposed burglary was told to him only after he, Vealey and Gilly had set out from Cleveland, Ohio on December 30, 1969; that once at the Yablonski residence he remained in the automobile as a lookout during the burglary operation and did not enter the house; that the coin collection was not found, but that he received at the scene $90 as his one-third share of cash which was stolen, and later the guaranteed amount; and that he did not learn until five or six days later that murders had been committed at the Yablonski home. The jury, obviously, did not believe Martin's story.

side. When they had returned to Cleveland, Vealey and Martin were paid off by Paul Gilly.

Some eighteen errors are assigned, all of them directed to the purported necessity of a new trial. We are satisfied that no error of substance occurred, and will therefore affirm the three convictions of murder. The death sentences, however, will be vacated and the case remanded for resentencing.

The arguments advanced on behalf of appellant may be conveniently grouped into those pertaining to alleged errors which occurred prior to the commencement of the trial proper, those pertaining to errors in the admission of evidence at trial, and errors in the charge. We shall consider them in that order, followed by consideration of the sentencing.

## I.

### Alleged Pre-Trial Errors

1. *Change of venue.*

Appellant urges that massive and inflammatory pretrial publicity in Washington County foreclosed the possibility of a fair trial, and that the trial court thus erred in refusing the motion for change of venue.[2]

---

2. The motion was filed on October 28, 1971, four days prior to the scheduled start of the trial on November 1, 1971. Rule 305 of the Pennsylvania Rules of Criminal Procedure (effective January 1, 1965) provides that "no pretrial application shall be considered if made less than ten days before trial unless opportunity therefor did not exist or the defendant or his attorney was not aware of the grounds for the application." The court scheduled a hearing on the motion for November 1, 1971, stating that it would receive as evidence bearing on the motion "anything that has happened from and since the 21st of October at noon." Appellant does not now argue that this limitation was in error, and there is no need, therefore, to detail the chronology of events prior to October 28 which clearly establish that there was opportunity to present a timely application and an awareness of the grounds therefor. Suffice it to say that a motion had been made in August for money to conduct a public opinion survey in the county as a preliminary step to applying for a change of venue. This motion was denied on October 15, the court then stating its

The newspaper accounts admitted into evidence at the change of venue hearing were comprised of one story which described picketing at the United Mine Workers headquarters in Washington, D.C. by supporters of Jock Yablonski; four relating to the denial of Martin's motion for continuance of the trial; one relating to an arrest of appellant's brother; and nine relating to the change of venue motion. In four of these 15 articles mention is made of a statement given by Claude Vealey in June which had implicated Martin, three of the articles mentioning that implication.

This court has many times said that "It is clearly established that the grant or refusal of a change of venue or of a continuance is within the sound discretion of the trial Court." *Commonwealth v. Richardson*, 392 Pa. 528, 540, 140 A.2d 828, 835 (1958). See also *Commonwealth v. Powell*, Pa., 328 A.2d 507 (1974); *Commonwealth v. Martinolich*, 456 Pa. 136, 318 A.2d 680, 683 (1974), appeal dismissed, 419 U.S. 1065, 95 S.Ct. 651, 42 L.Ed.2d 661 (1974); *Commonwealth v. Yount*, 455 Pa. 303, 314 A.2d 242 (1974); *Commonwealth v. Swanson*, 432 Pa. 293, 248 A.2d 12, (1968), *cert. denied*, 394 U.S. 949, 89 S.Ct. 1287, 22 L.Ed.2d 483 (1969); *Commonwealth v. Hoss*, 445 Pa. 98, 283 A.2d 58 (1971).

In *Hoss, supra,* where we upheld a refusal to change the venue, we reviewed the considerations bearing on the exercise of discretion as delineated in *Rideau v. Louisiana*, 373 U.S. 723, 83 S.Ct. 1417, 10 L.Ed.2d 663 (1963) and *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed. 2d 751 (1961). We identified three factors as having particular relevancy: length of time between arrest and trial; the effort of the trial court to abate publicity; and

opinion that "The newspaper, television and radio coverage of this event has not been legally offensive in tone nor viciously slanted." We have independently reviewed the pre-October 21 material, the most important of which were reports relative to Vealey's confession and guilty plea in June, 1971. We agree with the trial court that it was basically factual and not inflammatory.

whether publicity had caused prospective jurors to form an opinion of guilt. Addressing those factors as they apply to the case at bar, the record shows the following:

(1) Martin's trial (voir dire) commenced on November 3, 1971, twenty-one months following his arrest. For about a year and a half of that time Martin was in Ohio, and fighting against extradition to Pennsylvania. In *Hoss* the time span was five months, which we called a "lengthy time period." 445 Pa. at 106, 283 A.2d at 63. The twenty-one month period in this case was more than sufficient to permit the tide of publicity which followed the Yablonski slayings and subsequent arrests to ebb.

(2) In the instant case, as in *Hoss,* the trial court released an administrative memorandum or order as early as April 29, 1970 seeking to abate publicity.[3] So far as appears, the restrictions thus imposed were observed both by counsel in this case and by the news media.

**3.** The memorandum, in relevant part, was as follows:

"Law enforcement personnel other than the elected District Attorney and the elected Sheriff are specifically forbidden to give any interviews to any news media concerning the proceedings during the pendency of such proceedings without the prior written approval of the President Judge. By agreement with the County Commissioners, the members of the Commissioners' staff are likewise so forbidden. Elected officials are advised that statements by them could prejudice the outcome of proceedings and the use of discretion is advised.

"During the pendency of the proceedings, no media representative or any person other than counsel of record shall interview any grand juror, juror or witness, for the purpose of publication of his testimony, attitudes or views regarding or in any way related to the proceedings whose pendency invokes these rules, and counsel of record are limited to those contacts permitted by the Canons of Ethics or by the Court.

"The contempt power will be exercised against any person, who, knowing that the proceedings are pending, disseminates by any means of public communication, an extra-judicial statement related to the defendant or to the issues in the case that goes beyond the public record of the court in the case, that is wilfully designed by that person to effect the outcome of the trial and that seriously threatens to have such an effect or make such a statement intending that it be disseminated by any means of public communication. ("The Rights of Fair Trial and Free Press", section 4.1)."

■■ (3) With reference to fixed opinions of guilt by veniremen, the voir dire examination is, of course, the proper occasion to develop the facts. "The voir dire examination is the proper place to determine whether a defendant's public notoriety has resulted in a prospective juror's prejudice." *U. S. v. Hoffa,* 367 F.2d 698 (7th Cir. 1966), vacated on other grounds, 394 U.S. 310, 89 S. Ct. 1163, 22 L.Ed.2d 297 (1969). This is the normal rule and practice in Pennsylvania. *Commonwealth v. Jones,* 452 Pa. 299, 304 A.2d 684 (1973); *Commonwealth v. McGrew,* 375 Pa. 518, 525, 100 A.2d 467, 470 (1953). In the case at bar, 107 veniremen were asked whether they had heard, read or seen anything about the facts of the case, and 97 answered in the affirmative. On the other hand, only 23 of the 221 persons examined stated that they had formed a fixed opinion of guilt. In *Hoss,* the corresponding ration was 26 out of 138. Cf. *Irvin v. Dowd, supra.* It is established that only those jurors who possess fixed, unalterable opinions of guilt are erroneously not excused. As the Supreme Court of the United States stated in *Irvin v. Dowd, supra:* "To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court." 366 U.S. at 723, 81 S.Ct. at 1642.

■ It is clear to us, therefore, that appellant did not establish at the voir dire examination that a fair and impartial jury could not be empanelled. Indeed, our own examination of the pre-trial publicity indicates that while it was extensive, it was, as in *Hoss,* basically "factual in nature" and concerned largely with "reports of the procedural developments of the case." See 445 Pa. at 105, 283 A.2d at 63. The journalists showed remarkable

restraint in their reporting. It is worth remarking that although the order denying the change of venue was without prejudice to a renewal of the motion at the conclusion of the voir dire, no such motion was made.[4]

■ It is true, of course, that there can be pre-trial publicity so sustained, so pervasive, so inflammatory and so inculpatory as to demand a change of venue without putting the defendant to any burden to establish a nexus between the publicity and actual jury prejudice. Denial of due process of law is found to be inherent in the situation. Such a case was *Commonwealth v. Pierce*, 451 Pa. 190, 303 A.2d 209 (1973), *cert. denied,* 414 U.S. 878, 94 S.Ct. 164, 38 L.Ed.2d 124 (1973).[5] See also *Sheppard v. Maxwell,* 384 U.S. 333, 352, 86 S.Ct. 1507, 16 L.Ed.2d 600, 614 (1966); *Estes v. Texas,* 381 U.S. 532, 85 S.Ct. 1628, 14 L.Ed.2d 543 (1965). It is enough to say that the egregiously prejudicial elements of *Pierce* are absent in the case at bar.

2. *"Keyman" Jury Selection*

Appellant has challenged the "keyman" jury selection process as it operates in Washington County. There appear to be two aspects to appellant's argument. First, there is a claim that this process involves an improper delegation of authority by the jury commissioners to the "keymen" under the Act of April 10, 1867, P.L. 62, § 2, 17 P.S. § 942. Second, it is asserted that the "keyman"

4. At the opening of trial on Tuesday, November 9, 1971, immediately after selection of the jury had been completed, defense counsel moved for a mistrial or a continuance on the ground that several newspaper articles "during the last few days" had made it impossible for Martin to receive a fair trial. The motion was refused. It is to be noted that as jurors were selected they were immediately sequestered.

5. In Pierce the Court believed that three kinds of newspaper publicity in particular were "inherently prejudicial": (1) reports containing information received *from the police* that Pierce, *the defendant,* had confessed to being the "triggerman"; (2) reports that the defendant had a prior record for violent crimes; (3) reports, replete with pictures, that the defendant had participated in a staged reenactment of the murder.

process denied appellant his right to a fair trial, to due process of law and to equal protection of the laws because it resulted in a jury which did not reflect a representative cross section of the community. The issue was properly preserved for appeal.

(1) The selection of and qualifications of jurors in Washington County, a County of the third class, are governed by the Act of April 16, 1925, P.L. 244, as amended, 17 P.S. § 1322, et seq. and the Act of April 10, 1867, P.L. 62, § 2, 17 P.S. § 942. The Act of 1925, as amended, 17 P.S. § 1332, provides that the jury board in third class counties is to consist of the judges of the court of common pleas and the two elected jury commissioners and that one of the judges and the two commissioners shall constitute a quorum of the board. The Act of 1867 provides for the method of selecting persons to serve as jurors:

"It shall be the duty of said jury commissioners, president judge, or additional law judge of the respective district, or a majority of them, to meet at the seat of justice of the respective counties, at least thirty days before the first term of the court of common pleas, in every year, and thereupon proceed, *with due diligence to select,* alternately, from the whole qualified electors of the respective county, at large, a number, such as at the term of the court of [common] pleas next preceding shall by the said court be designated, of sober, intelligent and judicious persons, to serve as jurors in the several courts of such county during that year; and the said jury commissioners, president judge, or additional law judge, or a majority of them, shall, in the mode and manner now directed by law, place the names of persons so selected in the proper jury wheel, and the said jury wheel, locked as now required by law, shall remain in the custody of the said jury commissioners, and the keys thereof in the

custody of the sheriff of said county." 1867, April 10, P.L. 62, § 2. (emphasis added)

The Washington County "keyman" system operated in the following manner. The prospective jurors were selected by the elected jury commissioners, one Democrat and one Republican, and a judge of the court of common pleas,[6] each providing one-third of the 2,000 names placed in the jury wheel. Each jury commissioner mailed out 402 questionnaires, one to each of the party committee members in every precinct in Washington County, requesting the names of 4 prospective jurors. Each commissioner received approximately 90% of the questionnaires back, thus obtaining the names of 1500 to 1600 names by this method. In addition, each commissioner received from other sources between 150 and 400 other names. Each jury commissioner then personally selected the 666 prospective jurors which he was responsible for obtaining. The judge obtained names of prospective jurors by personally getting in touch with various civic, fraternal, voluntary, church and veterans organizations throughout Washington County.

■ Appellant contends that these selection procedures are inconsistent with the requirements of the Act of 1867 that the jury commissioners are "with due diligence to select" prospective jurors because the commissioners in effect merely rubber stamp the politicians' choices. A similar challenge was made to the Washington County keymen system in the case of *Grove v. Toninecz*, 189 Pa.Super. 32, 149 A.2d 547 (1959). The Superior Court, although stating that it was "not approving the method here used as worthy of universal adoption," 189 Pa.Super. at 41, 149 A.2d at 552, found that the provisions of the Act of 1867 requiring that jurors be selected from the "whole qualified electors" of the county was directory and not mandatory and that therefore the

---

6. The judge in the case at bar was the Hon. Richard DiSalle.

"keyman" procedure was not in violation of the Act of 1867. In reaching the conclusion that the language was directory, the Court relied upon the decision of this Court in *Commonwealth v. Zillafrow*, 207 Pa. 274, 56 A. 539 (1903). We there had this to say of the provision in question: "The statutory provisions alleged to have been disregarded, though not followed literally, were not contravened as to spirit or intent. The provisions themselves are directory in character. They do not prescribe or bear upon the substance of any duty, but merely upon the manner of its performance, and do not differ in this respect from other provisions of the same or analogous acts which have already been held to be directory only." (citations omitted). What the Superior Court said in *Grove, supra*, would appear to be directly on point in the instant case: "Conceivably, political considerations in some instances might result in the selection of jurors who should never be permitted to serve. But there is nothing in the record to indicate that any of the persons suggested by the commissioners was not qualified or that the defendant in drawing a jury on the trial of this case was in any way prejudiced." 189 Pa.Super. at 41, 149 A.2d at 552.

In *Commonwealth v. Carroll*, 443 Pa. 518, 278 A.2d 898 (1971), this Court upheld the "keyman" system as it operated in Erie County against a challenge similar to the one in this case. The practice in Erie was much like that in Washington County. The two elected jury commissioners contacted the committeemen of the political parties in Erie and leaders of various churches, social, civic and fraternal organizations soliciting names of prospective jurors. This resulted in furnishing half of the names placed in the jury wheel. The other half was supplied by three judges of the court of common pleas, one of whom obtained the names he placed in the wheel by going through the voter registration lists and gathering names. We said of these procedures: "The 'key-

man' jury selection system has been sustained where there is evidence that the jury commissioners have familiarized themselves with all of the significant elements in the community and have made a special effort to consult leaders from these various population groups." 443 Pa. at 525, 278 A.2d at 901. We find that the evidence here too is adequate to support the finding of the trial court that the jury commissioners familiarized themselves with and consulted the significant segments of the community. Thus we conclude that the Act of 1867 and the Act of 1925 were complied with.

■■■ (2) The other facet to the "keyman" selection challenge is constitutional: that the Sixth Amendment guarantee of trial by jury—encompassing as it does the "fair possibility for obtaining [on the jury] a representative cross-section of the community," *Williams v. Florida*, 399 U.S. 78, 100, 90 S.Ct. 1893, 1906, 26 L.Ed.2d 446, 460 (1970)—is violated by the system in vogue in Washington County. See also *Taylor v. Louisiana*, 419 U.S. 522, 95 S.Ct. 692, 42 L.Ed.2d 690 (1975). Martin claims · that the keyman method does not allow for the inclusion, at least in adequate numbers, of the youth, the poor, the unemployed, the blacks, the Democrats and the politically independent of the community. To advance this argument it is not necessary that Martin be a member of all of these groups, or any of them. See *Peters v. Kiff*, 407 U.S. 493, 92 S.Ct. 2163, 33 L.Ed.2d 83 (1972). But he must establish at least a "prima facie case of invidious discrimination" before "the burden of proof shifts to the State to rebut the presumption of unconstitutional action." *Alexander v. Louisiana*, 405 U.S. 625, 631–32, 92 S.Ct. 1221, 1226, 31 L.Ed.2d 536, 542 (1972). In *Alexander*, the claim was principally that the defendant was denied equal protection of the laws and due process of law because he had been indicted by a grand jury which had been empanelled from a venire on which were only a token number of Negroes. After reviewing the opera-

tion of the process in the parish involved, the Supreme Court concluded that a "prima facie case of discrimination" had been made out. 405 U.S. at 629–31, 92 S.Ct. at 1224–1226, 31 L.Ed.2d at 541–42. The Court went on to observe: "This Court has never announced mathematical standards for the demonstration of 'systematic' exclusion of blacks but has, rather, emphasized that a factual inquiry is necessary in each case that takes into account all possible explanatory factors. The progressive decimation of potential Negro grand jurors is indeed striking here, but we do not rest our conclusion that petitioner has demonstrated a prima facie case of invidious racial discrimination on statistical improbability alone, for *the selection procedures themselves were not racially neutral.* The racial designation on both the questionnaire and the information card provided a clear and easy opportunity for racial discrimination." 405 U.S. at 630, 92 S.Ct. at 1225, 31 L.Ed.2d at 542. (Emphasis supplied) See also *Turner v. Fouche,* 396 U.S. 346, 360, 90 S.Ct. 532, 24 L. Ed.2d 567, 579 (1970); *Whitus v. Georgia,* 385 U.S. 545, 87 S.Ct. 643, 17 L.Ed.2d 599 (1967); *Avery v. Georgia,* 345 U.S. 559, 73 S.Ct. 891, 97 L.Ed. 1244 (1953).

It is a fair reading of these cases that a method of jury selection which violates the Sixth Amendment guarantee of trial by jury must involve not only statistical improbability of inclusion of a particular seg-. ment of the community, but an inherently non-neutral— *i. e.,* discriminatory—selection procedure.[7] In the case before us appellant has failed to demonstrate the presence of either of these factors. The only statistical information presented to us is that of the 221 prospective jurors questioned in the voir dire, only 3 were black, but it is said to be unlikely that the keyman selection system

7. Although the case before us involves a petit jury as opposed to a grand jury, the same principles apply. *Alexander, supra,* 405 U.S. at 626, n. 3, 92 S.Ct. at 1223, 31 L.Ed.2d at 539 n. 3; *Pierce v. Louisiana,* 306 U.S. 354, 358, 59 S.Ct. 536, 83 L.Ed. 757, 760 (1939).

would turn up unregistered voters and that "[i]t is common knowledge that this group of unregistered voters include large numbers of blacks and youths." (Brief for appellant at 28) It is also contended that because there are approximately 66,000 registered Democrats and only 29,000 registered Republicans in Washington County, the keyman system "discriminates against political parties and affiliations alone in better than a two-to-one ratio." (*id.* at *24*) These bare allegations, quite unsupported by the testimony of anyone having actual knowledge of the operation of the system or by any interpretive or expert opinion evidence, are insufficient to establish a prima facie case of invidious discrimination against any of the groups allegedly improperly excluded. Nor has there been any specific showing of how the keyman system discriminates against these groups. The fact that a subjective element is present in the selection process does not by itself make the procedure inherently discriminatory. Unlike the situations found to be present in *Alexander, Avery* and *Whitus, supra,* appellant has failed to demonstrate that the jury commissioners of Washington County were aware of the age, race, color, political affiliation, etc. of the persons whose names were received in response to their questionnaires, and that the commissioners then had the opportunity to select potential jurors on the basis of such characteristics or affiliations.

The paucity of evidence in this record to support the allegation of discrimination in Washington County's jury selection system distinguishes this case from that decided by the Third Circuit Court of Appeals in *Smith v. Yeager,* 465 F.2d 272 (3d Cir., 1972). The Court there held invalid the keyman system as it operated in Essex County, New Jersey. This was not, however, a ruling of unconstitutionality *per se;* there was ample statistical evidence of discrimination against blacks; and there was evidence that the jury commissioners had given up seeking the names of potential black jurymen from likely

sources. In contrast, the evidence here is that the three persons charged with the duty of selecting potential jurors fulfilled their duties responsibly; they had familiarity with the various significant elements comprising the community and consulted with leaders of those elements to aid them in the selective process. There was no proof that those selected were unqualified and no proof of invidious or systematic discrimination against or exclusion of any group. Cf. *Commonwealth v. Jennings,* 446 Pa. 294, 300, 285 A.2d 143 (1971).

We hold that the attack on the keyman system in Washington County as applied to this case is without merit.

3. *Voir Dire Examination*

Appellant alleges that several reversible errors occurred during the course of the voir dire examination. The principal of these relates to the scope of the voir dire itself, appellant contending that in light of the refusal of the court to grant a change of venue, a more thorough inquiry of prospective jurors should have been permitted.

As this Court stated in *Commonwealth v. McGrew,* 375 Pa. 518, 525, 100 A.2d 467, 470 (1953), "the examination of jurors under voir dire is solely for the purpose of securing a competent, fair, impartial and unprejudiced jury." We also there observed that "the scope of a voir dire examination rests in the sound discretion of the trial Judge and his decisions, even in a challenge for cause, will not be reversed in the absence of palpable error." *Id.* at 526, 100 A.2d at 471.

In the present case the trial judge, the Hon. Charles G. Sweet, permitted defense counsel to ask 20 out of 90 questions submitted; he allowed the Commonwealth to ask three questions, the third dealing with scruples concerning the death penalty; and he himself propounded eleven questions. Without detailing them,

we think that the scope of the inquiries put to the panel was sufficiently searching and was well calculated to "securing a competent, fair, impartial and unprejudiced jury." *McGrew, supra.* We find no abuse of discretion.

Appellant complains, specifically, that the judge's question as to whether a juror had formed a "fixed" opinion as to the guilt or innocence of Aubran Wayne Martin was too restrictive; that the question should have been directed to whether *any* opinion had been formed. This complaint is without merit under our case law. *Commonwealth v. Lopinson,* 427 Pa. 284, 298, 234 A.2d 552 (1967), vacated on other grounds, 392 U.S. 647, 88 S.Ct. 2277, 20 L.Ed.2d 1344 (1968). ("The only legitimate inquiry in this area was whether or not the juror had formed a fixed opinion in the case as to the accused's guilt or innocence"). See also *Commonwealth v. Hoss,* 445 Pa. 98, 283 A.2d 58, 64 (1971); *Commonwealth v. Swanson,* 432 Pa. 293, 300, 248 A.2d 12, 16 (1968); *Commonwealth v. McGrew, supra,* 375 Pa. at 525, 100 A.2d 467; *Irvin v. Dowd,* 366 U.S. 717, 723, 81 S.Ct. 1639, 6 L.Ed.2d 751, 756 (1961). The complaint is also without foundation in the record. Martin's lawyer was allowed to ask jurors whether they had heard or read anything about the case on television, radio or in the newspapers, and, if so, "what was the opinion you got from that"; he was not limited to "fixed" opinions in that question.

The trial judge's rulings concerning three episodes during the several days of the voir dire examination are also asserted as prejudicial error. One incident was that a person identified as a member of the Miners for Democracy (a Yablonski-oriented group) said to three members of the venire panel during a luncheon break that it would be an honor to serve on the Martin jury. It is to be noted that persons addressed were prospective jurors only, and there is no showing that any of

them was selected for the petit jury. The rule of presumptive prejudice relative to conversations with a juror during a trial is therefore not applicable. Cf. *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954). The judge conducted a hearing nevertheless, and while he dismissed the incident as trivial, he allowed questions to be asked about it on voir dire. In the absence of any showing of prejudice, we find no error in the court's refusal to strike the entire venire panel.

The next occurrence was the discovery that a juror who had been selected and sequestered was a sister-in-law of a Washington County detective. The detective was not a prosecution witness and the potentiality for prejudice found present in some other cases was thus absent here. Cf. *Turner v. Louisiana*, 379 U.S. 466, 85 S.Ct. 546, 13 L.Ed.2d 424 (1965); *United States ex rel. Fletcher v. Cavell*, 287 F.2d 792 (3d Cir. 1961). In any event, Judge Sweet excused the juror and allowed the defense an extra challenge for cause. We find no abuse of discretion either in not allowing an additional peremptory challenge [8] or in not striking the entire panel of jurors, as the appellant requested.

The final incident during the voir dire stage which was claimed to be so prejudicial as to call for a mistrial was the publication in a Washington, Pa. newspaper of a report that two of Martin's alleged co-felons in the Yablonski murders, Paul Gilly and Silous Huddleston, had pleaded guilty; whereas in fact both had pleaded not guilty. At the time the article appeared (Saturday, November 6, 1971) nine jurors had been selected and sequestered. The trial judge, when the matter was called to his attention, informed the incoming venire

**8.** The appellant also makes a broader claim to additional peremptory challenges beyond the allotted twenty because of the magnitude of the pre-trial publicity. The number of challenges is fixed by statute, however, and the court was without power to enlarge it. *Commonwealth v. Segers*, 460 Pa. 149, 331 A.2d 462 (1975).

panel of the inaccuracy, and allowed defense counsel to interrogate the remaining prospective jurors as to this news item. Under these circumstances we find no abuse of discretion in denying the mistrial motion.

### 4. The "Death-Qualified" Jury

At the time of trial, the death penalty was an available option to the jury should the defendant be found guilty of murder in the first degree.[9] Veniremen were questioned by the prosecution as to their views on the death penalty and several challenges for cause because of their responses were sustained, over appellant's objections. The appellant claims that error in these rulings resulted in a "death-qualified" jury.

The claimed error is that the trial judge failed to comply with the standards expressed by the Supreme Court of the United States in *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968). The nub of the Court's holding is "that a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty or expressed conscientious or religious scruples against its infliction." 391 U.S. at 522, 88 S.Ct. at 1777, 20 L. Ed.2d at 784–85. The Court declined, however, "to announce a *per se* constitutional rule requiring the reversal of every conviction returned by a jury selected as this one was [i. e., in noncompliance with the above standard]" *Id.* at 518, 88 S.Ct. at 1775, 20 L.Ed.2d at 782. Indeed, the Court in *Witherspoon* merely reversed as to

---

**9.** Imposition of the death penalty was in fact recommended by the jury. The recommendation was followed by the trial court at the time of sentencing, which took place in 1973. In the meantime, the Supreme Court of the United States held the death penalty unconstitutional as applied in the State of Georgia. *Furman v. Georgia*, 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). On the basis of *Furman*, this Court in 1972 outlawed the death penalty in Pennsylvania. *Commonwealth v. Bradley*, 449 Pa. 19, 295 A.2d 842 (1972). The propriety of the imposition of the sentence in this case is discussed *infra*, part IV.

the sentence of death; it permitted the conviction itself to stand. See also *Moore v. Illinois,* 408 U.S. 786, 92 S. Ct. 2562, 33 L.Ed.2d 706 (1972); *Bumper v. North Carolina,* 391 U.S. 543, 88 S.Ct. 1788, 20 L.Ed.2d 797 (1968) in which the Court refused to apply *Witherspoon* because Bumper had been sentenced only to life imprisonment and not to death.

In the recent case of *Commonwealth v. Dukes,* 460 Pa. 180, 331 A.2d 478 (1975) we considered and rejected a claim similar to appellant's. There, after reviewing the holdings of *Witherspoon* and *Bumper,* we observed:

"Consonant with these cardinal decisions of the Supreme Court of the United States, this Court has repeatedly held that in cases in which the death penalty has not been imposed or in which a sentence of death has been imposed but cannot be carried out as a result of the decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), noncompliance with the Witherspoon standard of jury selection is irrelevant. [Citations omitted]".

*Id.* at 188–189, 331 A.2d at 482. See also *Commonwealth v. Ashburn,* 459 Pa. 625, 331 A.2d 167 (1975). Since in the instant case we have determined that the death penalty was not properly imposed, see *infra,* appellant's challenge falls within the ambit of *Dukes, supra,* and its antecedents.[10]

Appellant's argument relative to the challenges for cause which the trial court sustained proceeds to another claim of due process denial, namely, that the exclusion of jurors with an aversion to the death penalty resulted, if not in a "death-qualified" jury, in one that was at least "conviction prone." Thus it is argued that "the

10. We do not suggest, by not discussing on their merit the several challenges for cause here in question, that the teaching of *Witherspoon v. Illinois,* 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) was in fact disregarded by the trial court.

kind of juror who would be unperturbed by the prospect of sending a man to his death is the kind of juror who would too readily ignore the presumption of innocence, and accept the prosecution's version of the facts, and return a verdict of guilty." Appellant's brief at 35.

In *Witherspoon, supra,* the Supreme Court of the United States refused to accede to this argument because the data there before it were "too tentative and fragmentary", 391 U.S. at 517–18, 88 S.Ct. at 1774–75, 20 L.Ed. 2d at 782. This Court likewise rejected the same contention in *Commonwealth v. Speller,* 445 Pa. 32, 282 A.2d 26 (1971) because it was "without persuasive foundation and is mere speculation." 445 Pa. at 35, 282 A.2d at 28. See also *Commonwealth v. Hudson,* 454 Pa. 117, 314 A.2d 231 (1974) ; *Commonwealth v. Kenney,* 449 Pa. 562, 297 A.2d 794 (1972); Commonwealth v. Roach, 444 Pa. 368, 282 A.2d 382 (1971).[11] We hold the trial court was not in error in following these cases, and that it applied them correctly.

11. Conceding that the cited decisions represent the current state of the case law, appellant claims that the empirical data hitherto found lacking have now been supplied in Professor Hans Zeisel's study, "Some Data on Juror Attitudes Towards Capital Punishment".

This study, apparently completed in 1972, was under the auspices of the Center for Studies in Criminal Justice, University of Chicago Law School. From the introduction by Norval Morris, Director of the Center, we learn that a rough draft of the Study was used by defense counsel in their briefs in *Witherspoon v. Illinois, supra,* and *Bumper v. North Carolina, supra.* See *Witherspoon,* 391 U.S. at 517 n. 10, 88 S.Ct. at 1774, 20 L.Ed.2d at 782 n. 10. While we have no reason to doubt the statements that the original data have been augmented and the analysis improved, and have respect·for the author of the study, we are not persuaded that the finished study requires us to reach a conclusion contrary to that arrived at in *Witherspoon, Bumper* and *Speller supra.* The time period of the *Zeisel* investigation was 1954–55, the places Cook County, Illinois and Kings County N.Y.; the sampling was of 464 jurors' votes. That this may be adequate for a meaningful study on juror attitudes we have no doubt but its acceptance as a basis for a change of the law of Pennsylvania in this case is a different matter altogether.

5. *Pre-Trial Discovery*

 Appellant asserts that his pretrial discovery was unduly limited, and therefore (so we infer) that a prejudicial abuse of discretion was committed. While complaining that the court "summarily denied" his motions for production of documents, etc., appellant overlooks that the prosecution agreed to a production of a large segment of the requested items;[12] that the court ordered discovery in accordance with this consent of the Commonwealth, and held a hearing on the items not agreed to; that although the motion was denied "for overbreadth", the denial was with leave to counsel to refile; that a new motion was filed and another hearing held; that at this hearing it was agreed that still other results of the State's investigation would be made available to appellant,[13] and that the items as to which production or inspection was finally denied boiled down basically to ballistic reports, fingerprints, notes of oral statements made by appellant and statements of co-conspirators.[14] These discovery proceedings were conducted between August 16 and the last week of October. They resulted in giving appellant a considerably broader discovery than he was entitled to by our rules,[15] and the

12. The Commonwealth agreed to allow the defendant to copy or examine defendant's written confession or statements; any and all exculpatory evidence in its possession; all objects removed from the deceaseds' premises; fingernail scrapings from the victims' bodies; photographs taken at the scene; and the criminal records of all witnesses for the prosecution at the time they are called to testify. As to the autopsy reports, the prosecution advised that they were available from the proper medical authorities.

13. The further agreement was that appellant could inspect the objects removed from the home of the victims, the murder weapons and additional photographs of the scene of the crime.

14. We are advised by the Commonwealth's brief at 18 that a copy of Claude Vealey's confession was given to appellant's counsel several months prior to trial.

15. The applicable rule is Pa.R.Crim.P. 310. It provides that on timely application the court may order that the defendant or his attorney shall be permitted to inspect and copy or photograph

few items appellant was denied were not discoverable under the rule.[16] No "exceptional circumstances or compelling reasons", in the words of Pa.R.Crim.P. 310, see n. 15, *supra*, were proved to warrant the production that was denied,[17] nor is it alleged that any prejudice resulted from inability to inspect the non-produced items. See *Commonwealth v. Caplan*, 411 Pa. 563, 192 A.2d 894 (1963) ; cf. *DiJoseph's Petition*, 394 Pa. 19, 145 A.2d 187 (1958). There was thus no "summary" action by the trial court and there was no abuse of discretion. *Commonwealth v. Mamon*, 449 Pa. 249, 297 A.2d 471 (1972).

 The appellant argues, however, that regardless of the rule of court limiting discovery, "[n]o category of information within the possession of the prosecution is altogether immune from the disclosure duty" of the prosecution under the rule of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Appellant's brief at 10. The rule set forth in *Brady* is that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irre-

"any written confessions and written statements made by the defendant." The Rule then stipulates "No other discovery or inspection shall be ordered except upon proof by the defendant, after hearing, of exceptional circumstances and compelling reasons. . . . In no event, however, shall the court order pretrial discovery or inspection of written statements of witnesses in the possession of the Commonwealth."

16. For suggestions that the Pennsylvania discovery rule should be "liberalized", see *Commonwealth ex rel. Specter v. Shiomos*, 457 Pa. 104, 110, 112, 320 A.2d 134 (1974) (concurring opinions of Pomeroy, J. and of Nix, J.). *See and compare* Rule 16 of the Federal Rules of Criminal Procedure; A.B.A. Standards Relating to Discovery and Procedure Before Trial, § 2.1.

17. As an "exceptional circumstance" warranting special treatment, appellant cited to the trial court and here repeats the fact that he had been in Ohio for a number of months after his arrest while contesting extradition, and that this delayed getting into the defense of the Pennsylvania prosecution. He also pointed to his untutored and impecunious condition in life as a "compelling reason". The trial court was not impressed with these contentions, nor are we.

spective of the good faith or bad faith of the prosecution." 373 U.S. at 87, 83 S.Ct. at 1196, 10 L.Ed.2d at 218. There is, of course, no doubt that evidence of this nature—that is, evidence that "would tend to exculpate [a defendant] or reduce the penalty," *Ibid.*,—may not, as a constitutional matter be withheld, and that a rule of court to the contrary must give way. *Lewis v. Lebanon County Court of Common Pleas*, 436 Pa. 296, 301, 260 A.2d 184, 187 (1969). But the Supreme Court has never given *Brady* the all-encompassing reading now contended for. See, e. g., *Giles v. Maryland*, 386 U.S. 66, 73–74, 87 S.Ct. 793, 796–797, 17 L.Ed. 737, 744 (1967); *Moore v. Illinois*, 408 U.S. 786, 794, 92 S.Ct. 2562, 2567, 33 L.Ed. 2d 706, 713 (1972). See also *Commonwealth v. Martinolich*, 456 Pa. 136, 161 n. 16, 318 A.2d 680, 694, n. 16 (1974).

In the case at bar the Commonwealth agreed to supply to appellant any evidence of an exculpatory nature. See n. 12 *supra*. No such material was forthcoming, however, for the prosecution represented to the trial court, as it does in this Court, that in fact it had in its possession no evidence that would tend to exculpate Martin. Martin contends that it should be the court's judgment, not that of the prosecution, which controls in a matter of such importance. The trial court declined to conduct an in camera inspection of the results of the prosecution's investigation in order to make its own independent appraisal of the evidence. We agree that it had no obligation so to do. As the Court of Appeals for the Fourth Circuit has put it, the rule of *Brady* "does not make it incumbent upon the trial judge to rummage through the file on behalf of the defendant." *United States v. Frazier*, 394 F.2d 258, 262 (4th Cir. 1968), *cert. denied*, 393 U.S. 984, 89 S.Ct. 457, 21 L.Ed.2d 445. See also *United States v. Harris*, 409 F.2d 77, 80–81 (4th Cir. 1969), *cert. denied, sub nom. Venning v. United States*, 396 U.S. 965, 90 S.Ct. 447, 24 L.Ed.2d 430

(1969); *United States v. American Radiator and Standard Sanitary Corp.*, 433 F.2d 174, 202 (3d Cir. 1970), *cert. denied,* 401 U.S. 948, 91 S.Ct. 928, 28 L.Ed.2d 231 (1971).[18]

## II.

### *Alleged Trial Errors*

We turn now to consideration of alleged errors pertaining to the trial itself.

(1) The first of these is a charge that the holding of a night session on the first day of trial was an abuse of discretion and that it deprived appellant of the effective assistance of counsel at that session. *Powell v. Alabama,* 287 U.S. 45, 53 S.Ct. 55, 77 L.Ed. 158 (1932); *Commonwealth ex rel. Washington v. Maroney,* 427 Pa. 599, 235 A.2d 349 (1967).

 Counsel first objected to the night session on the ground of his need to use the evening hours for conferences in preparation for the next day's session. We recognize that in our system of adversary proceedings a trial is an arduous affair, demanding the closest attention and the most alert responses that counsel can muster, that it is a drain both on nervous energy and physical stamina, and that the day's work is by no means over for the lawyer when the afternoon session comes to a close. In like manner, of course, a trial can be tiring, even to the point of exhaustion, to parties, witnesses, judges, jurors and other court personnel. Normally, therefore, evening sessions are to be avoided. In this

---

**18.** The only item not produced which is now said by appellant to be within the *Brady* category is a psychological report and evaluation of Martin that, it is said, would have been useful to the defense at the penalty phase of the trial. The Commonwealth states that the only such document in its possession was a competency report. This was obtained on court order on motion of appellant made November 1, 1971. We are told that the report, which found Martin competent to stand trial, was given to appellant by the court prior to trial. Appellee's brief at 20–21.

case, however, the court decided to order the extra session because the trial had not commenced until the afternoon of that day, the jury had already been sequestered for several days, and a number of witnesses scheduled to testify on the first trial day had come from out-of-State locations. Under these circumstances we cannot say that overruling of the objection was an unreasonable exercise of discretion.

Later in the afternoon the objection to continuing the trial into the evening was renewed on the ground that counsel was coming down with a cold or the "flu", but the objection was again overruled. If it were established that counsel was indeed ineffective at the night session by reason of illness, we would have to determine whether prejudice had resulted from such ineffectiveness sufficient to vitiate the remainder of the trial. We have concluded, however, that no ineffectiveness has been shown.

Our standard for judging effectiveness of counsel for a defendant in a criminal trial is whether the conduct of the lawyer "had *some reasonable basis* designed to effectuate his client's interest . . . the balance tips in favor of a finding of effective assistance as soon as it is determined that trial counsel's decision had any reasonable basis." *Commonwealth ex rel. Washington v. Maroney, supra,* 427 Pa. at 604–05, 235 A.2d at 352–53. We have reviewed the record of the session in question against this standard. It lasted not quite an hour and a half. Fourteen witnesses for the Commonwealth were heard. Most of the witnesses were persons who had discovered various objects associated with the crimes, and their testimony was quite routine and unexceptionable. Defense counsel conducted no cross-examination of seven of these witnesses. Several other witnesses recounted an occasion when Jock Yablonski and others searched for a strange automobile whose occupants, it was believed, were seeking to kill Yablonski. Counsel did cross-exam-

ine these witnesses, and also another witness who stated
that he had sold an automobile to Martin in Cleveland
the day of the murders. On this record, it is impossible
to say that counsel was in any way ineffective during the
night session in question; his choice of witnesses to be
examined and of the subject-matter that called for exam-
ination appears to have been altogether reasonable.
Since appellant was not incompetently served at the ses-
sion in question, he was not harmed in any way by the
trial court's action. It follows that we need not inquire
further as to whether an abuse of discretion occurred
when the judge refused to accede to the claim of illness.
Cf. *Commonwealth ex rel. Gallagher v. Rundle*, 423 Pa.
356, 223 A.2d 736 (1966); *Commonwealth ex rel. Jones
v. Maroney*, 417 Pa. 567, 209 A.2d 285 (1965).

(2) Appellant objected to certain testimony by an F.
B.I. Agent, Michel, a witness for the Commonwealth, in
which Michel related the contents of an oral statement
given him by Aubran Martin during an interview on
January 15, 1970, approximately two weeks before he
was arrested for the Yablonski crimes. The agent testi-
fied that Martin was given his full *Miranda* warnings,
*Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.
Ed.2d 694 (1966), but that the printed form of waiver of
rights was not signed "because of the fact he stated he
understood his rights fully . . . he said he would
be willing to answer questions but not sign the form."
Michel then testified that in response to his questions
Martin answered that he did not know where he had
been on the day of the murder; that he had not bought a
car with a girl named Joanne Guinn; and that he did
not know any one named "Paul" or "Claude". Notwith-
standing that these statements were altogether exculpato-
ry in nature, Martin now contends that testimony as to
what he had said should not have been admitted into evi-
dence because, first, prior to making of the statements
Martin had declined to sign a written waiver of his *Mi-*

*randa* rights and, second, because at no time was he asked by police officers if he was represented by counsel.

Appellant's first argument for suppression of Michel's testimony seems to be that the oral statement should not have been admitted because Martin's refusal to sign the written *Miranda* waiver form is a conclusive indication that his oral waiver was not knowing and intelligent. We do not doubt that in some situations a refusal of a person being questioned to sign a waiver form, even though followed by an apparent willingness to allow further questioning, can be indicative of confusion or ignorance such as to require the police to seek additional assurances of intelligence and understanding before proceeding further. See e. g., *United States v. Nielsen,* 392 F.2d 849 (7th Cir. 1968); *United States v. Jenkins,* 440 F.2d 574 (7th Cir. 1971). In other situations the absence of a written waiver has not been thought to vitiate oral statements. See *United States v. Crisp,* 435 F.2d 354 (7th Cir. 1971), *cert. denied,* 402 U.S. 947, 91 S.Ct. 1640, 29 L.Ed.2d 116 (1971); *Hodge v. United States,* 392 F.2d 552 (5th Cir. 1968). See also *Commonwealth v. Canales,* 454 Pa. 422, 311 A.2d 572 (1973).

The record here satisfies us that Martin was aware of his rights and voluntarily gave the oral statements now challenged. Although Martin took the stand, he understandably did not dispute these statements, and at the end of the trial his lawyer agreed with the trial judge that there would be no error in not presenting to the jury the matter of the voluntariness of the statements given to Michel.

Nor do we accept the argument that as a matter of law the warnings were inadequate because Martin was not asked if he then had a lawyer. We know of no case holding this to be a requirement. Appellant relies upon *Sullins v. United States,* 389 F.2d 985 (10th Cir. 1968). In that case, however, there was no waiver of *Miranda*

rights. The four defendants testified that they had requested counsel but that these requests were ignored. This was consistent with police testimony that "at no time had any one of the four expressly said that he or she did not want to consult a lawyer before making a statement." 389 F.2d at 988. There is no such evidence in the case before us, nor is there evidence that Martin was in fact represented by counsel at the time of the interview.

(3) Claude Vealey, a co-conspirator of Martin, was the chief Commonwealth witness. During cross-examination of Vealey and in an attempt to impeach his credibility, defense counsel confronted him with a document, defendant's Exhibit A, purporting to be a motion by Vealey's lawyer, Elmer A. Guiliani, filed in the Court of Common Pleas of Cuyahoga County, Ohio, to hire an investigator and seeking a writ of habeas corpus in order to avoid extradition to Pennsylvania. The motion stated that Vealey was not in Pennsylvania at the time of being indicted (presumably for the Yablonski murders) or "at any time". Attached to the motion, which was signed by the attorney, was an affidavit (not under notarial seal) purportedly signed by Vealey, that the facts stated in the motion were true. (The notary public who took the affidavit was also Elmer A. Guiliani.) The document had attached to it an authentication under triple seal, in accordance with the acts of Congress,[19] to the effect that it was from the records of "indictment and capias" of Claude E. Vealey in the Court of Common Pleas of Cuyahoga County, Ohio. Vealey stated that he did not remember this pleading nor signing the affidavit and refused to admit that the purported affidavit was his. The trial court, while agreeing that the document was apparently sufficient to show that it was of record in Ohio, did not allow it in evidence, observing, "we have

---

**19.** Act of May 26, 1790 and June 25, 1948, 62 Stat. 947, 28 U.S.C. § 1738.

not had it offered through any witness." [20] Indeed, there was no formal motion that it be accepted into evidence.

We find no error. The document was no doubt properly entitled to full faith and credit under the acts of Congress as an official record from a judicial proceeding in Ohio, but there was nothing whatever in the record in Ohio or here to indicate that the notary public who purportedly took Vealey's ostensible affidavit was in fact a duly qualified and acting notary public in Ohio; this link was missing. Absent, therefore, any admission by Vealey that he made the affidavit and any testimony from Guiliani that he was a notary public and that he took the affidavit, there was no basis for using the document for cross-examination purposes or for its admission into evidence on an independent basis.[21]

(4) During the course of Martin's examination, in response to questions put to him by his lawyer, he admitted that in the past he had committed crimes of burglary, larceny, resisting arrest and disorderly conduct. On cross-examination, the prosecuting attorney was permitted, over objection, to inquire whether Martin had also perpetrated a firebombing. Martin denied that he had done so. In rebuttal, over defense objection, the Commonwealth introduced testimony by Claude Vealey that Martin had told him that he had in fact committed that offense. Appellant asserts that the cross-examination was improper, and hence also the rebuttal testimony.

The Act of March 15, 1911, P.L. 20, § 1, 19 P.S. § 711 forbids examination of a criminal defendant as to prior offenses (other than the one with which he is charged)

---

**20.** Attorney Elmer A. Guiliani was not then available as a witness. The court gave permission to have the defense case reopened for the purpose of taking his testimony if the attorney should later appear. This did not happen.

**21.** None of the following Pennsylvania statutes is applicable to this situation; the Act of August 21, 1953, P.L. 1323, § 20, 57 P.S. § 166; the Act of December 14, 1854, P.L. 724, § 2, 28 P.S. § 222; the Act of April 27, 1876, P.L. 49, § 1, 28 P.S. 223.

unless, *inter alia*, the defendant "has given evidence tending to prove his own good character or reputation." The trial court allowed the questioning as to firebombing under this exception to the general statutory proscription.

In *Commonwealth v. Smith*, 432 Pa. 517, 248 A.2d 24 (1968) this Court was faced with a very similar situation:

> "Two errors are alleged. One is that the court below erred in permitting the appellant to be cross-examined as to his prior arrests which did not result in convictions. The court held that appellant had put his character in issue when, after he was asked if he had had any difficulty with the police, he narrated only two convictions, and emphasized several mitigating circumstances with regard to those. This testimony, the court indicated, led to the inference that appellant's character was good on the whole. He thus held that questions as to prior arrests not leading to convictions were proper under the first exception in the Act of March 15, 1911, P.L. 20, § 1, 19 P.S. § 711 . . . . We agree with the analysis of the court below as to this issue." 432 Pa. at 519–520, 248 A.2d at 25.[22]

We think the rationale of *Smith* dictates resolution of the present issue adversely to appellant. He had grasped the initiative by admitting to several seemingly minor offenses of a non-violent character; it was then open to the Commonwealth to show that he had also committed a more serious offense of a violent nature. We

22. The only difference between this case and *Smith* is that in *Smith* the challenged cross-examination by the prosecution pertained to "prior arrests", whereas in the instant case reference was made only to a crime which Martin allegedy had committed. This difference is, however, of no significance, for the Act of 1911, in describing the areas of prohibited examination, includes offenses which the defendant allegedly "has *committed,* or been charged with, or been convicted of . . . "

note, additionally, that in his charge to the jury the trial court, in referring to this portion of the testimony, properly instructed the jury that they could consider it only "for the narrow purpose of contradicting Martin's statement about his own character." [23]

## III.

### *Charge on Felony-Murder*

In the course of his charge to the jury the trial judge, after instructing on the elements of premeditated murder, gave a careful and lengthy charge on the doctrine of felony-murder and its application to this case. Towards the end of this passage of his charge, the court summarized in the following terms:

"If you accept the Commonwealth's case in those terms, if you believe that the defendant Martin went in there with a gun and participated in the shooting of these people in their beds, and he did this for hire and for wicked gain, then you have classical first degree murder. If you accept the second theory, the felony murder theory, *and you can do that believing either the Commonwealth theory or the defense facts as testified to by Martin,* then you could find Martin guilty of murder in the first degree on the felony murder doctrine. The defendant's facts substantially as I explained to you fit the felony murder doctrine." (Emphasis supplied.)

23. In addition to the assignments of error treated above, the appellant has argued that three other rulings of the trial judge were in error and sufficiently prejudicial to require a new trial. These include the introduction into evidence of a photograph claimed to be inflammatory and rulings that the prosecution had not improperly denied defense counsel access to two possibly material witnesses for or during trial. In addition, it is claimed that a remark by the trial judge to both counsel relative to the length of summary arguments to the jury was prejudicial to the defendant. We have examined these alleged errors and find that they are without merit.

At trial the defendant took the position that no charge whatever was warranted on felony-murder,[24] and now argues vigorously that the inclusion of a charge on this subject was prejudicially erroneous and requires a new trial.

The thrust of appellant's argument is that neither on the Commonwealth's version of the case, as related in the Vealey testimony, nor on the defense account of what occurred, as testified to by Martin, does the felony-murder doctrine have any place in resolving Martin's guilt or innocence. Under the prosecution version, Aubran Martin was in on the planning stage of the Yablonski slayings, including the burglary of their home; was an active participant not only in both of those crimes, but was himself the thief who took Jock Yablonski's money clip; and that Martin also received in due course his share of the fee for the murders. If the prosecution's theory of what happened is accepted, so appellant's argument does, the sole purpose of the conspiracy among Gilly, Vealey and Martin was to kill the Yablonskis, and the fact that execution of the purpose was preceded by a breaking and entering and followed by a robbery was purely incidental. Under Martin's version of what transpired he was never a party to any plan to kill; he was merely a participant in a scheme to burglarize and rob the Yablonski home, and aided and abetted that scheme by serving as a lookout and driver of the getaway car; he joined with his two confederates in testing firearms before the group

**24.** The objection was made by an interruption of the judge in the course of his charge, not by way of a specific objection or exception to the claimed error at the close of the charge (only a general exception to the charge was taken). This was not the proper procedure. See Pa.R.Cr.P. 1119(b), 19 P.S. (1975 Pamphlet). Because, however, the trial court was fully alerted to the position of the defendant, not only by the interruption, but also by reason of objection to such an instruction before the charge was begun, and in light of the fact that the point was argued to and fully considered by the court en banc on post-trial motions, we do not consider it to have been waived for appeal purposes. Cf. *Commonwealth v. Clair*, 458 Pa. 418, 326 A.2d 272 (1974).

set out from Cleveland; he himself carried a rifle to their automobile, and knew that it and a pistol were carried by Gilly and Vealey to the house to be robbed. If this testimony is to be believed, then, appellant's theory continues, the fact that the sole purpose of Gilly and Vealey was to kill the Yablonskis and not to commit burglary or robbery renders the felony-murder rule inapplicable as far as implicating Martin goes. That is to say, under either account of what happened there was then no meeting of the minds—no agreement—as to the purpose for going to the Yablonski home, and Martin cannot be held liable for what his companions did without his knowledge or consent.

Whichever version the jury might believe as to the sordid events at Clarksville, Pa. on the morning of December 31, 1969, three stark facts stand out with indisputable clarity: first, the home of Jock Yablonski was burglarized—that is, it was forcibly broken into and entered with the intent to commit a felony;[25] second, after the breaking and entering three persons asleep in the house—Jock Yablonski, his wife and his daughter—were slain in cold blood; third, immediately after the killings, a sum of money ($270) was stolen from the home—that is, a robbery was committed. When these facts are considered in light of the well established principles governing the felony-murder rule in Pennsylvania we must find appellant's arguments to be without merit. See generally *Commonwealth v. Yuknavich*, 448 Pa. 502, 506–07, 295 A.2d 290 (1972); *Commonwealth v. Redline*, 391 Pa. 486, 495, 137 A.2d 472, 476 (1958); Act of June 24, 1939, P.L. 872, § 701, 18 P.S. § 4701 (repealed, June 6, 1973, replaced by 18 Pa.C.S. § 2502(a)).

The proposition that the felony-murder rule is not applicable where the accompanying felony is after the fact of murder and but incidental to it, is quickly answered

---

**25.** Act of June 24, 1939, P.L. 872, § 901, 18 P.S. § 4901 (repealed, June 6, 1973).

by our decision in *Commonwealth v. Waters,* 445 Pa. 534, 538, 285 A.2d 192, 194 (1971) among others. In *Waters* we stated:

> "We considered and expressly rejected this same contention in *Commonwealth v. Slavik,* 437 Pa. 354, 261 A.2d 583 (1970). There we said: 'This contention was recently considered and rejected by this Court in *Commonwealth v. Wilson,* 431 Pa. 21, 244 A.2d 734. In that case, a conviction of first-degree murder was sustained upon evidence that the defendant first stabbed the victim and then took the victim's wallet and emptied it. The Court, quoting from *Commonwealth v. Hart,* 403 Pa. 652, 170 A.2d 850, said (431 Pa. page 28, 244 A.2d page 738): "Defendant's highly technical argument amounts to this: Unless the Commonwealth proves that the intention to commit a robbery was formed before the beginning of the fatal assault, the evidence cannot amount to a murder which was committed in the perpetration of a robbery. In other words, defendant would require a televised stopwatch in every robbery or felony-killing to prove that the felonious intent existed before the attack . . ."' 437 Pa. at 357, 358."

See also *Commonwealth v. Slavik,* 437 Pa. 354, 358, 261 A.2d 583 (1970). ("This Court has held that if a homicide occurs in the perpetration or attempt to perpetrate a robbery, a conviction of murder in the first degree will be sustained regardless of when the design to rob was conceived. *Commonwealth v. Stelma,* 327 Pa. 317, 192 A. 906"); *Commonwealth v. Hart,* 403 Pa. 652, 170 A.2d 850 (1961); *Commonwealth v. Dickerson,* 406 Pa. 102, 107, 176 A.2d 421, 424 (1962); ("if a homicide occurs while the defendant is participating in . . . a robbery, it is immaterial when the design to rob was conceived. A felony murder is effected").

Martin's second argument, addressed to his own fact version, that there was "no meeting of the minds" of

the conspirators, is novel. But we are not here dealing with the niceties attendant upon the formation of a contract; we are dealing with the ramifications of a criminal conspiracy to commit a felony. That Martin did not know ahead of time that his companions, Gilly and Vealey, were intent on killing and not on robbery is immaterial; he knew that violence might be involved, whether or not planned ahead of time. In *Commonwealth v. Yuknavich*, 448 Pa. 502, 295 A.2d 290 (1972), the defendant was the driver of a getaway car for a service station robbery. In the course of the robbery the co-felon killed the attendant. Speaking through Justice Nix, we said:

"This Court has consistently held that the killing need not be by the defendant in a felony-murder case. It has been established 'that in order to convict for felony-murder, the killing must have been done by the defendant or by an accomplice or confederate or by one acting in furtherance of the felonious undertaking.' *Commonwealth v. Redline*, 391 Pa. 486, 496, 137 A.2d 472, 476 (1958); accord, *Commonwealth v. Sampson*, 445 Pa. 558, 563, 285 A.2d 480, 483 (1971); *Commonwealth v. Moore*, 443 Pa. 364, 374, 279 A.2d 179, 185 (1971); *Commonwealth v. Williams*, 443 Pa. 85, 88, 277 A.2d 781, 783 (1971); *Commonwealth ex rel. Smith v. Myers*, 438 Pa. 218, 228, 261 A.2d 550, 555 (1970); *Commonwealth v. Batley*, 436 Pa. 377, 390, 260 A.2d 793, 800 (1970). Clearly, where a killing occurs in the commission of a felony, all who participate therein are equally guilty of murder." 448 Pa. at 507, 295 A.2d at 293.

The rationale which the Court then gave of the rule reiterated in the above quoted portion of the *Yuknavich* opinion is equally applicable to the case at bar:

"The nature of the felony in this case is such that it should be obvious to anyone about to embark on such a venture that the lives of the victims may be sacrificed in accomplishing the end. A reasonable man can be

properly charged with the knowledge that the natural and probable consequences of such an act may well result in death or grievous bodily harm to those involved. It is not unrealistic to ascribe to one who willfully engages in a plan to commit armed robbery, a wickedness of disposition, hardness of heart, cruelty, recklessness of consequences, or a mind regardless of social duty. Thus, when dealing with the felony of armed robbery we are merely saying that it is the same malice that is required for common law murder." *Id.*, 448 Pa. at 508, 295 A.2d at 293.

See also *Commonwealth v. Eiland,* 450 Pa. 566, 570–71, 301 A.2d 651, 652–53 (1973).

It may be accepted that in some situations the felony-murder rule operates harshly and that the policy of this Court is to restrain the rule within its traditional limits. See *Commonwealth ex. rel. Smith v. Myers,* 438 Pa. 218, 261 A.2d 550 (1970). The case before us is totally within those limits, and under any version of the facts cannot be said to impose "the consequences of murder upon a death wholly unintended." *Ibid.* at 225, 261 A.2d at 553. The trial court committed no error in charging as it did.

## IV.

### The Death Sentences

The jury returned a verdict on November 12, 1971 that Aubran Wayne Martin was guilty of murder in the first degree. On the following day, pursuant to the "split-verdict" provisions of the Act of June 24, 1939, P. L. 872, Sec. 701, as amended, 18 P.S. § 4701 the jury met to consider penalty. It fixed the penalty at death. Post-trial motions followed, and were denied by the court en banc by an opinion and order entered September 29, 1972. Approximately a year later, on September 19, 1973, a sentencing hearing was held by the trial judge at which the Commonwealth presented testimony and argu-

ments by both sides were heard. The court thereafter pronounced the sentence of death on appellant on each of the three indictments for murder.

On June 29, 1972 the Supreme Court of the United States announced its decision in *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972). Contemporaneously with its decision in *Furman v. Georgia, supra,* the United States Supreme Court vacated the death penalty in two cases from Pennsylvania which were then before it: *Phelan v. Brierley,* 408 U.S. 939, 92 S.Ct. 2875, 33 L.Ed.2d 762 (1972) (on certiorari from the U. S. Ct. of Appeals for the 3d Cir.); *Scoleri v. Pennsylvania,* 408 U.S. 934, 92 S.Ct. 2852, 33 L.Ed.2d 747 (1972) (on certiorari from the Supreme Court of Pennsylvania). See also *Stewart v. Massachusetts,* 408 U.S. 845, 92 S.Ct. 2845, 33 L.Ed.2d 744 (1972). The applicability of *Furman* to the law of Pennsylvania came before this Court in *Commonwealth v. Bradley,* 449 Pa. 19, 295 A.2d 842 (1972). In *Bradley,* the Court said:

> "Appellant's final contention is that the imposition of the death penalty in his case violates the Eighth Amendment's ban against cruel and unusual punishments as applied to the states through the Fourteenth Amendment.
>
> In *Furman v. Georgia,* 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346 (1972), the United States Supreme Court recently held that imposition of the death penalty under statutes such as the one pursuant to which the death penalty was imposed upon appellant is violative of the Eighth and Fourteenth Amendments. Accordingly, appellant's sentence of death may not now be imposed. See *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972)." (footnote omitted) 449 Pa. at 23–24, 295 A.2d at 845.

*Bradley's* interpretation of the *Furman* decision has been consistently followed and death sentences imposed have been vacated in every case which has come to us

since *Furman*.[26] Our most recent decision in this line of cases is that of *Commonwealth v. Dobrolenski,* 460 Pa. 630, 334 A.2d 268 (1975). We were there presented with much the same record and argument as the Commonwealth has offered in the case at bar.[27] What Justice Roberts said in speaking for the Court in *Dobrolenski* is equally applicable here:

> "We have repeatedly held that Furman precludes imposition of death penalty under the statute in question. *Commonwealth v. Scoggins,* 451 Pa. 472, 481, 304 A.2d 102, 108 (1973) ; *Commonwealth v. Ross,* 449 Pa. 103, 105, 296 A.2d 629, 630 (1972); *Commonwealth v. Lopinson,* 449 Pa. 33, 34, 296 A.2d 524, 525 (1972) ; *Commonwealth v. Sharpe,* 449 Pa. 35, 44, 296 A.2d 519, 524 (1972); *Commonwealth v. Bradley,* 449 Pa. 19, 23–24, 295 A.2d 842, 845 (1972); cf. *Common-*

26. In an opinion from the bench at the conclusion of oral arguments in the case at bar, the sentencing judge reviewed the salient statutes and decisions and expressed the view that the death sentence was not unconstitutional in Pennsylvania. In the course of his remarks he explained his conclusion as follows:

> "In order that this matter may be reconsidered by the higher courts, it is necessary that a capital case get there. If all judges sentenced all murderers, even the most depraved and heinous, merely to life in prison, the general effect of *Furman v. Georgia* would become specific and universal. Because I believe that the Supreme Court of Pennsylvania has been acting in the past month only in deference to *Furman v. Georgia,* and not as a result of their own moral and legal philosophies—because I believe that *Truesdale* [*Commonwealth v. Truesdale*] (449 Pa. 325 [296 A.2d 829] (1972) and *Bradley* (449 Pa. 19 [295 A.2d 842] (1972) are ipsedixit only and because I believe that the protection of our community and the wickedness of this defendant demands the death penalty, I have elected to sentence Aubran Wayne Martin to death in the manner and form that shall be provided by law at the time his appeals have been exhausted."

27. We have been furnished with an extensive brief *amicus curiae* by the Legal Defense and Educational Fund in opposition to the Commonwealth's position. In light of our decision that he question of the reach of *Furman v. Georgia, supra* is no longer an open one in Pennsylvania with respect to the statute under which Martin was sentenced, see Act of June 24, 1939, P.L. 872, Sec. 701, as amended, 18 P.S. § 4701, we have not deemed it necessary to address the arguments tendered by the *amicus.*

*wealth v. Senk,* 449 Pa. 626, 296 A.2d 526 (1972). The Commonwealth recognizes this but offers an evidentiary record, not present in those cases, purporting to show that there has been no discrimination in the imposition of the death penalty on the basis of race, wealth, or nature of the proceeding leading to conviction (jury trials vs. pleas of guilty). However, as we recognized in the above cases, Furman holds that 'the imposition of the death penalty *under statutes, such as here involved,* is violative of the Eighth and Fourteenth Amendments.' *Commonwealth v. Scoggins,* supra, 451 Pa. at 481, 304 A.2d at 108 (emphasis added). Had we viewed evidence of the actual application of the statute as necessary for determination of its constitutionality, we would have directed evidentiary hearings in those cases. As we understand Furman, the constitutional prohibition extends at least to all death sentences imposed pursuant to statutes which give the sentencing authority unfettered discretion in imposition of the death penalty. Because this *statute* gives such discretion, the constitution forbids the execution of any death sentences imposed under its authority." *Id.* at 642–643, 334 A.2d at 274.

See also *Commonwealth v. Coyle,* 460 Pa. 234, 332 A.2d 442 (1975), *cert. denied,* 423 U.S. 844, 96 S.Ct. 81, 46 L. Ed.2d 66 (1975).

The death penalty was improperly imposed upon Martin and must be vacated as to each indictment. We will remand for the imposition of legal sentences.

The convictions of appellant on each of the three charges of murder in the first degree are affirmed; the sentences of death are vacated, and the case is remanded for resentencing.

ROBERTS, NIX and MANDERINO, JJ., concur in the result.

EAGEN, J., dissents.